**KRANJAC TRIPODI & PARTNERS LLP**
Xavier M. Bailliard
Joseph Tripodi
30 Wall Street, 12th Floor
New York, New York 10005
Tel: (646) 216-2400
Fax: (646) 216-2373
xbailliard@ktpllp.com
jtripodi@ktpllp.com

*Attorneys for Plaintiffs Santosh Singh,*
*Virendra Singh, and 63-65 Chestnut, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SANTOSH SINGH, VIRENDRA SINGH, and 63-65 CHESTNUT, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> TOWNSHIP OF WEEHAWKEN, MAYOR RICHARD F. TURNER, in his Official and Individual Capacities, FRANK TATTOLI, in his Official and Individual Capacities, GIOVANNI D. AHMAD, in his Official and Individual Capacities, RICHARD P. VENINO, in his Official and Individual Capacities, SHAUN D. MASTERSON, in his Official and Individual Capacities, and JOHN DOES 1-10, <br><br> Defendants. | Civil Action No. <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Santosh Singh, Virendra Singh, and 63-65 Chestnut, LLC, by and through their

attorneys, Kranjac Tripodi & Partners LLP, by way of Complaint against defendants Township

of Weehawken, Mayor Richard F. Turner, Frank Tattoli, Giovanni D. Ahmad, Richard P.

Venino, Shaun D. Masterson, and John Does 1-10, hereby allege as follows:

**INTRODUCTION**

1.      Plaintiffs Santosh Singh ("Singh") and Virendra Singh (collectively with Singh, the "Singhs") and 63-65 Chestnut, LLC ("63-65 Chestnut") bring this action under 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Federal Racketeer Influenced and Corrupt Organizations Act, (18 U.S.C. § 1961, *et seq.*), and the New Jersey Racketeer Influenced and Corrupt Organizations Act, (N.J.S.A. 2C:41-1, *et seq.*), as a result of the shocking abusive acts of the Township of Weehawken ("Weehawken") and certain of its officials who, at the direction of Mayor Richard F. Turner ("Turner"), and under color of law, engaged in a collective and coordinated scheme to harass, intimidate, retaliate against, and extort the Singhs—two elderly immigrants from India and long-time residents of Weehawken—over a period of over two years with the purpose of forcing them to provide Edward Devaney ("Ed Devaney") and Chris Devaney, two brothers who are family members of and personal friends with several Weehawken officials, police officers and employees, with practically free housing in a privately-owned, newly renovated apartment owned by Plaintiffs.

2.      As part of their egregious coordinated pattern of harassment, intimidation, retaliation and extortion, the defendants (i) made dozens of threatening calls to the Singhs over the course of eleven months; (ii) harassed and threatened tenants at the buildings owned by Plaintiffs; (iii) attempted to break into one of Plaintiffs' buildings; (iv) directed the Weehawken Public Works Department to arbitrarily cease picking up garbage and debris at Plaintiffs' buildings; (v) issued two entirely baseless stop work orders to prevent Plaintiffs from completing necessary renovations and repairs at Plaintiffs' buildings for four months; (vi) issued a third baseless stop work order to prevent Singh from performing minor work on her garden at the Singhs' personal residence; (vii) refused to lift the second of the three stop work orders until

Plaintiffs finally agreed to enter into a use and occupancy agreement in which Plaintiffs were forced to provide Ed Devaney with a newly renovated apartment at a shockingly low rent of $163 per month; and (viii) after Ed Devaney moved into the newly renovated apartment, issued a notice of over fifty building code violations at Plaintiffs' buildings.  As if the aforementioned abuse of power were not egregious enough, the defendants went as far as personally negotiating and drafting the use and occupancy agreement on behalf of Ed Devaney, and even forced Plaintiffs to sign the agreement at the Weehawken Town Hall – directly outside of Mayor Turner's office.

3.      In doing all of the above, the Weehawken officials used public funds and resources to advance the private personal gain of Ed Devaney and Chris Devaney, simply because they were friends and family members of the officials.

4.      Through this and other shocking abuse of power set forth in detail below, the defendants knowingly and deliberately deprived Plaintiffs of their constitutional rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution, and committed numerous violations of the Federal and New Jersey RICO statutes, for which Plaintiffs now seek redress.

## PARTIES

5.      Plaintiff Singh is an individual who resides in Weehawken, New Jersey.   Singh is a seventy-year-old immigrant from India and a citizen of the United States.

6.      Plaintiff Virendra Singh is an individual who resides in Weehawken, New Jersey. Virendra Singh is a seventy-five-year-old immigrant from India and a citizen of the United States.

7.      Plaintiff 63-65 Chestnut is a New Jersey limited liability company which maintains its headquarters and principal place of business in Weehawken, New Jersey.  The sole member of 63-65 Chestnut is Sandalwood Holdings Limited Liability Company, a New Jersey limited liability company which maintains its headquarters and principal place of business in Weehawken, New Jersey.  The members of Sandalwood Holdings Limited Liability Company are The Santosh Singh 2012 Family Trust and The Virendra Singh 2012 Family Trust.  The Santosh Singh 2012 Family Trust and The Virendra Singh 2012 Family Trust are New Jersey trusts with principal places of administration in New Jersey.

8.      Defendant Weehawken is a municipality organized under New Jersey law.

9.      Defendant Turner is an individual who, upon information and belief, resides in New Jersey.  Turner is and was at all times relevant herein the elected Mayor of Weehawken.  In such capacity, Turner is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Turner was acting under color of law.  Turner is sued in his official and individual capacities.

10.      Defendant Frank Tattoli ("Tattoli") is an individual who, upon information and belief, resides in New Jersey.  Tattoli is and was at all times relevant herein the Construction Official of Weehawken.  In such capacity, Tattoli is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Tattoli was acting under color of law.  Tattoli is sued in his official and individual capacities.

11.      Defendant Giovanni D. Ahmad ("Ahmad") is an individual who, upon information and belief, resides in New Jersey.  Ahmad is the Township Manager of Weehawken

and was, at all times relevant herein the Assistant Township Manager of Weehawken.  In such capacity, Ahmad is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Ahmad was acting under color of law.  Ahmad is sued in his official and individual capacities.

12.     Defendant Richard P. Venino ("Venino") is an individual who, upon information and belief, resides in New Jersey.  Venino is and was at all times relevant herein the Law Director of Weehawken.  In such capacity, Venino is and was at all times relevant herein a policymaker for Weehawken's administration and a supervisor of Weehawken government officials.  At all times relevant herein, Venino was acting under color of law.  Venino is sued in his official and individual capacities.

13.     Defendant Shaun D. Masterson ("Masterson") is an individual who, upon information and belief, resides in New Jersey.  Masterson is and was at all times relevant herein a building inspector for the Building Department of Weehawken.  At all times relevant herein, Masterson was acting under color of law.  Masterson is sued in his official and individual capacities.

14.     Defendants John Does 1-10 are fictitious individuals, which, upon information and belief, participated in the unlawful conduct alleged herein and are in some way responsible for the damages and injuries to Plaintiffs.  Plaintiffs will amend this Complaint to allege the true names and capacities of John Does 1-10 when ascertained.

15.     Defendants Turner, Tattoli, Ahmad, Venino, Masterson, and John Does 1-10 are referred to herein collectively and alternatively as the "Weehawken Officials."

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because Counts One through Eight of the Complaint arise under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and because Counts Ten and Eleven arise under 18 U.S.C. § 1961, *et seq*.

17.     The Court has supplemental jurisdiction over the state law claims in Counts Nine, Twelve and Thirteen of the Complaint pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form the same case or controversy.

18.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because all of the defendants are subject to personal jurisdiction in the District of New Jersey and because a substantial part of the events or omissions that gave rise to this action occurred in the District of New Jersey.

## FACTUAL ALLEGATIONS

### I.     IN 1996, PLAINTIFFS PURCHASE TWO BUILDINGS IN WEEHAWKEN

19.     Santosh Singh and Virendra Singh are elderly immigrants from India who own and manage numerous apartment buildings throughout Hudson County, New Jersey.

20.     Over the course of two decades, the Singhs have built a successful family business of purchasing various properties throughout Hudson County, which they have stabilized and subsequently rented to low-to-moderate income tenants.

21.     In or about June 1996, the Singhs purchased two connected buildings located at 63 Chestnut Street and 65 Chestnut Street ("63 Chestnut" and "65 Chestnut," respectively) in Weehawken, New Jersey.  In or about August 1997, the Singhs transferred title to 63 Chestnut and 65 Chestnut to 63-65 Chestnut.

22.     63 Chestnut is a three-floor building with two apartments on each floor, for a total of six residential units.  65 Chestnut is a three-floor building with one apartment on each floor, for a total of three residential units.  The Singhs themselves occupied the two top floor apartments in 65 Chestnut for approximately ten (10) years after purchasing the property.

23.     At the time the Singhs purchased the properties, Rosemary Devaney ("Mrs. Devaney") was a tenant in the first floor apartment (the "65 Chestnut Apartment") of 65 Chestnut.  Mrs. Devaney's rent was approximately $155 per month, which was substantially lower than the fair market value.

24.     Mrs. Devaney's son, Ed Devaney, lived with her in the 65 Chestnut Apartment. However, Ed Devaney was not a tenant.

25.     Ed Devaney and his brother, Chris Devaney, are family members with and close friends of several Weehawken officials, police officers and employees, including Masterson.  In fact, the Weehawken police captain would eat dinner on a daily basis at Mrs. Devaney's apartment.  In addition, throughout the time Ed Devaney resided in the 65 Chestnut Apartment with his mother, Weehawken police officers and other Weehawken officials and employees would regularly stop their vehicles in front of 65 Chestnut and would converse and socialize with Ed Devaney and Chris Devaney along with other Devaney family members.  During many of these visits, Ed Devaney and Chris Devaney would openly drink alcohol outside of the building. Moreover, upon information and belief, several Weehawken officials are aware that Chris Devaney regularly drove, and continues to drive, a vehicle in Weehawken without a driver's license.

II.   **ED DEVANEY REMAINS UNLAWFULLY IN THE 65 CHESTNUT APARTMENT AFTER HIS MOTHER PASSES AND FAILS TO PAY RENT FOR TWENTY-ONE MONTHS**

26.   On or about October 10, 2008, Mrs. Devaney passed away.

27.   At the time of her death, Mrs. Devaney's rent for the 65 Chestnut Apartment was only $163 per month.

28.   After Mrs. Devaney's death, Ed Devaney continued to reside in the 65 Chestnut Apartment even though he was not a lawful tenant.  Ed Devaney also continued to pay only $163 per month for rent.

29.   Because Plaintiffs knew that Ed Devaney was both friends with and related to several Weehawken government officials and employees, including several Weehawken police officers, Plaintiffs did not seek to evict Ed Devaney or increase the rent for the 65 Chestnut Apartment even though the fair market value was far greater than $163 per month, for fear of retaliation by those government officials.  Indeed, after Mrs. Devaney's death, Weehawken police officers and other Weehawken officials and employees continued to regularly stop their vehicles in front of 65 Chestnut and converse and socialize with Ed Devaney and Chris Devaney.

30.   Beginning in early 2010, Ed Devaney stopped paying the $163 monthly rent for the 65 Chestnut Apartment.  However, he continued to live in the 65 Chestnut Apartment.

31.   By October 29, 2012, Ed Devaney had failed to pay rent for twenty-one (21) months for the 65 Chestnut Apartment.

32.   Plaintiffs had always taken action against any of their tenants who defaulted on rental payments – and, in fact, continue to always take such action.

33.   However, because Plaintiffs knew that Ed Devaney was both friends with and related to several Weehawken government officials and employees, including several

Weehawken police officers—and, in fact, those officials continued to stop by 65 Chestnut to socialize with Ed Devaney and Chris Devaney—Plaintiffs did not seek to evict Ed Devaney for his failure to pay the rent, for fear of retaliation by those government officials.  As set forth below, that fear was entirely justified.

34.     Due to that same fear of retaliation, Plaintiffs had not sought to recover over twelve (12) months of past rent due from Ed Devaney's brother, Chris Devaney, for an apartment Chris Devaney had previously occupied at 63 Chestnut, but had vacated.  Singh also never sought to evict Chris Devaney due to her fear of retaliation by the Weehawken government officials, and Chris Devaney merely voluntarily vacated the apartment when he decided to move to southern New Jersey.

## III.   HURRICANE SANDY CAUSES EXTENSIVE DAMAGE TO 63 CHESTNUT AND 65 CHESTNUT AND RENDERS THE 65 CHESTNUT APARTMENT THAT ED DEVANEY OCCUPIED UNINHABITABLE

35.     On October 29, 2012, the State of New Jersey was hit with Hurricane Sandy, a devastating storm that was and continues to be one of the greatest natural disasters to hit the State of New Jersey.

36.     During the hurricane, the basement and entire first floors of 63 Chestnut and 65 Chestnut, including the 65 Chestnut Apartment occupied by Ed Devaney, were severely flooded and suffered extensive damage.  All of the electrical components, boilers, and hot water heaters in both buildings were destroyed.  In addition, the two first floor apartments in 63 Chestnut and the 65 Chestnut Apartment occupied by Ed Devaney were rendered completely uninhabitable.

37.     Because 63 Chestnut and 65 Chestnut had suffered extensive damage, shortly after the hurricane, Ed Devaney and another tenant were provided temporary housing by the Federal Emergency Management Agency ("FEMA") at the Sheraton Lincoln Harbor Hotel (the

"Sheraton") in Weehawken.  Such assistance from FEMA was common and was meant to provide tenants whose housing had been rendered uninhabitable as a result of the hurricane with time to find new, permanent housing.

## IV.  IMMEDIATELY AFTER HURRICANE SANDY, PLAINTIFFS BEGIN REMEDIATION AND REPAIR WORK AT 63 CHESTNUT AND 65 CHESTNUT

38.    Immediately after the hurricane, Plaintiffs began efforts to hire appropriate contractors to remediate and repair the extensive damage caused by the flooding at 63 Chestnut and 65 Chestnut.  It is an understatement to state that due to the widespread devastation caused by the hurricane throughout the State of New Jersey, and particularly Hudson County, finding any contractor to do any remediation and repair work was not an easy task.

39.    Notwithstanding, on or about November 7, 2012—only a week after Hurricane Sandy—Plaintiffs, as a result of their extensive efforts, were able to retain contractors who immediately began remediation and repair work at 63 Chestnut and 65 Chestnut.

## V.  ONLY A FEW WEEKS AFTER THE HURRICANE, THE WEEHAWKEN OFFICIALS BEGIN HARASSING PLAINTIFFS AND DIRECTING THEM TO PROVIDE HOUSING FOR ED DEVANEY AND CHRIS DEVANEY

40.    Beginning on November 19, 2012, despite Plaintiffs' extensive efforts to begin work at 63 Chestnut and 65 Chestnut as quickly as possible, the Weehawken Officials began subjecting the Singhs to a coordinated pattern of egregious harassment, intimidation and extortion aimed at forcing Plaintiffs to immediately repair the 65 Chestnut Apartment that Ed Devaney occupied, even though Plaintiffs had no legal or other duty to do so.

41.    On November 19, 2012 alone, the Weehawken Officials subjected Singh to a barrage of ten (10) telephone calls regarding the status of the remediation and repair work at 63 Chestnut and 65 Chestnut.  Singh understood that the Weehawken Officials had a particular interest in 65 Chestnut only because Ed Devaney—who Singh knew was a close friend and

family member of several Weehawken officials, employees and police officers—lived in that building.

42.     The next day, on November 20, 2012, Singh received another two (2) calls from the Weehawken Officials, again inquiring regarding the status of the remediation and repair work at 63 Chestnut and 65 Chestnut.

43.     On or about that same day, Plaintiffs obtained the necessary initial construction permit to perform rehabilitation and repairs at 63 Chestnut and 65 Chestnut as a result of the hurricane.

44.     On or about November 23, 2012, Plaintiffs were able to have an adjuster from their insurance company inspect the extensive damage to 63 Chestnut and 65 Chestnut for purposes of determining the amount of insurance proceeds Plaintiffs would receive in order to continue the remediation and repair work at the building.  Because the damage caused by the hurricane was so extensive, Plaintiffs needed the insurance proceeds in order to complete the remediation and repair work to the building.

45.     On November 29, 2012, defendant Tattoli called Singh and incredibly told Singh that she had to bring her credit card to the Sheraton and pay for Ed Devaney and Chris Devaney to continue staying at the hotel.  Since Plaintiffs had no legal or any other obligation or duty to provide Ed Devaney and/or Chris Devaney with alternative housing after the hurricane rendered the first floors of 63 Chestnut and 65 Chestnut uninhabitable—let alone pay for their rooms at the Sheraton—Singh rightly refused to do so.

46.      On or about that same day, Tattoli called Singh again.  This time, Tattoli shockingly informed Singh that Weehawken had now decided to repair 63 Chestnut and 65

Chestnut—which are privately-owned buildings—itself and that it would place a lien on the properties as a result thereof.

47.     As a result of Tattoli's threat, Plaintiffs were forced to continue all remediation and repair work at 63 Chestnut and 65 Chestnut even though Plaintiffs had not yet received any insurance proceeds, and thus had to incur all costs at their own expense.  Otherwise, as threatened by Tattoli, a lien would be placed on the property.

48.     Instead of actually following through on the threat to perform the work and place a lien on the properties, the Weehawken Officials instead decided to further harass and intimidate Plaintiffs and to impede Plaintiffs' efforts to complete the remediation and repair work at 63 Chestnut and 65 Chestnut.

49.     Indeed, in late November, 2012, the head of Weehawken's Department of Public Works informed Singh that Weehawken would no longer be picking up garbage and construction debris at 63 Chestnut and 65 Chestnut, and directed Singh to retain the services of a private dumpster company.

50.     Accordingly, Plaintiffs were forced to hire and pay for a private dumpster company at their own expense to dispose of garbage and debris at 63 Chestnut and 65 Chestnut.

51.     Shockingly, after Plaintiffs hired a private dumpster company, Weehawken continued to regularly pick up garbage and construction debris at every other building and/or residence neighboring 63 Chestnut and 65 Chestnut – this, even though Plaintiffs' garbage and debris was of exactly the same nature and volume as the other similarly-situated property owners' garbage and debris that Weehawken continued to pick up and discard.

52.     Weehawken's sudden refusal to pick up garbage and debris at 63 Chestnut and 65 Chestnut was entirely arbitrary and capricious and without any rational basis, and was done for

no reason other than to harass, intimidate, and retaliate against Plaintiffs because they had refused to pay for Ed Devaney's and Chris Devaney's continued stay at the Sheraton.

53.     The Weehawken Officials' harassment and intimidation of Plaintiffs did not stop there, and in fact only increased and became more egregious.

54.     Between December 14, 2012 and December 31, 2012, Singh received approximately eighteen (18) telephone calls from various Weehawken Officials berating Singh regarding the status of remediation and repairs at 63 Chestnut and 65 Chestnut.

55.     Notwithstanding the Weehawken Officials' constant harassment and intimidation, Plaintiffs diligently continued the remediation and repair work at 63 Chestnut and 65 Chestnut even though Plaintiffs had not yet received any insurance proceeds from their insurance company.

56.     In fact, by December 31, 2012, Plaintiffs had replaced all of the boilers and hot water heaters in the basement of 63 Chestnut and 65 Chestnut, and had removed all flooring on the first floor of both buildings, except for two rooms in the 65 Chestnut Apartment where Ed Devaney had stored all of his personal belongings and furniture.

57.     Plaintiffs had repeatedly asked Ed Devaney to remove his personal belongings and furniture from the 65 Chestnut Apartment.  However, he had not done so.

58.     Because Ed Devaney had not removed his personal belongings and furniture from the 65 Chestnut Apartment, Plaintiffs could not begin repair work in that apartment. Accordingly, in order to complete all work as quickly and efficiently as possible, Plaintiffs began work at 63 Chestnut, specifically repairing and renovating the two first floor apartments, which were completely empty.

59.     A couple of weeks later, in mid-January 2013, Singh was contacted by a Weehawken Official who specifically asked Singh why Plaintiffs had begun work on the two empty apartments at 63 Chestnut, but had not begun work on the 65 Chestnut Apartment that had been occupied by Ed Devaney.  Singh responded that they had begun work on the two apartments at 63 Chestnut and not the 65 Chestnut Apartment because Ed Devaney had failed to remove his personal belonging and furniture from the apartment.  While Ed Devaney had subsequently removed his belongings from the apartment, Plaintiffs had by then already started work on the two apartments at 63 Chestnut, and logically would need to finish those apartments before they could start work on the 65 Chestnut Apartment.  This was unacceptable to the Weehawken Officials.

60.     At this point in time, Plaintiffs knew that they needed to remediate and repair the two first floor apartments at 63 Chestnut and the 65 Chestnut Apartment as soon as possible due to the Weehawken Officials' harassment and intimidation, even though Plaintiffs had not yet received any insurance proceeds to fund the work.

61.     However, Plaintiffs were concerned that Ed Devaney would not be able to pay the rent for the 65 Chestnut Apartment once the work on the apartment was completed since he had already failed to pay twenty-one (21) months of rent for the same apartment prior to the hurricane.

62.     Accordingly, in or about the third week of January, 2013, in response to the Weehawken Officials' continued harassment to provide Ed Devaney with an apartment, Singh asked Ed Devaney to apply for state and city rental assistance along with federal rental assistance pursuant to Section 8 of the Housing Act of 1937 (42 U.S.C. § 1437, *et seq.*) to ensure that he

could afford to pay the rent for the apartment.  Ed Devaney was very offended by this suggestion and walked away.

63.     The Weehawken Officials were also unhappy with Singh's request that Ed Devaney seek rental assistance, which Ed Devaney immediately communicated to them.  On the very same day Singh made the request, Masterson—for no valid reason—suddenly began going to 63 Chestnut and harassing and being belligerent with Plaintiffs' tenants who lived in the two upper floor apartments of 63 Chestnut and had chosen to stay in the building after the hurricane. Masterson also continuously loitered at 63 Chestnut and 65 Chestnut, knocked on the front door of the buildings, and attempted to gain entry into the buildings.  On one occasion, Masterson actually attempted to break into 63 Chestnut.  When he was unable to do so, he demanded that one of the tenants allow him to enter the building; however, because he could provide no valid reason—because he had none—for gaining entry to the building, the tenant did not allow him to enter.

VI.     **THE WEEHAWKEN OFFICIALS ISSUE A FIRST BASELESS STOP WORK ORDER TO HARASS, INTIMIDATE, AND RETALIATE AGAINST PLAINTIFFS, WHICH THE WEEHAWKEN OFFICIALS IMMEDIATELY LIFT AFTER PLAINTIFFS RELUCTANTLY AGREE TO PROVIDE ED DEVANEY WITH A RENOVATED APARTMENT AT 63 CHESTNUT**

64.     On January 29, 2013—only days after Singh requested that Ed Devaney seek rental assistance—Tattoli issued an entirely baseless Stop Construction Order (the "First Baseless Stop Work Order"), which ordered Plaintiffs to cease all construction at 63 Chestnut and 65 Chestnut on the purported grounds that Plaintiffs had "FAILED TO OBTAIN THE PROPER BUILDING PERMITS/INSPECTIONS FOR 2ND FLOOR WORK" at 63 Chestnut. A true copy of the First Baseless Stop Work Order is attached hereto as Exhibit A.

65.     In addition to its timing—*i.e.* in direct retaliation for Singh's request that Ed Devaney seek rental assistance—the very issuance of the First Baseless Stop Work Order was egregious and entirely arbitrary and capricious.  Indeed, no Weehawken Official or other employee had formally inspected the second floor apartments at 63 Chestnut—thus, they could not have had any basis for believing that Plaintiffs had failed to obtain any permits for work on those apartments.  Moreover, the work that had been done on the second floor apartments consisted solely of replacing the entrance door to each apartment, which did not require permits.

66.     There was therefore no valid or rational basis for the issuance of the First Baseless Stop Work Order.

67.     Immediately after the First Baseless Stop Work Order was issued, Singh met with Tattoli to ask for an explanation as to the basis for the order.  During the meeting, Tattoli made several shocking demands and representations to Singh.

68.     Tattoli first demanded that Singh immediately remediate and repair the 65 Chestnut Apartment that was occupied by Ed Devaney.  In response, Singh again explained that Plaintiffs had begun work on the two first floor apartments at 63 Chestnut because Ed Devaney had failed to remove his belongings from the 65 Chestnut Apartment when the work began.  Once work on the two apartments was finished, Singh confirmed that Plaintiffs would immediately begin work on the 65 Chestnut Apartment.

69.     Tattoli made clear that this was unacceptable, and explained that he was getting three calls every day from Turner's office, the police department, and Chris Devaney, who were all demanding that the remediation and repairs of the 65 Chestnut Apartment be completed immediately.

70.     Singh asked why Chris Devaney, who was not a tenant of Plaintiffs, was repeatedly calling about 65 Chestnut.  Tattoli remarkably responded "I have to get Chris Devaney in the building."

71.     As would be made clear later, the First Baseless Stop Work Order had been issued for the sole purpose of harassing, intimidating and retaliating against Singh for not having immediately completed the remediation and repairs of the 65 Chestnut Apartment that was occupied by Ed Devaney.

72.     The fact that the Weehawken Officials were actively and aggressively abusing their power to force Plaintiffs to provide private housing for a private citizen at Plaintiffs' own expense was intimidating and frightening to Singh, especially since she believed she had no available recourse to protect Plaintiffs against such actions.  Moreover, as Tattoli had just disclosed, the Weehawken Officials also intended to force Plaintiffs to provide Chris Devaney with housing as well.

73.     Accordingly, because she had no other alternative to get the First Baseless Stop Work Order lifted and to enable Plaintiffs to continue the remediation and repairs of 63 Chestnut and 65 Chestnut, Singh agreed—despite knowing that there were no valid grounds for the issuance of the First Baseless Stop Work Order—to rent one of the newly renovated first floor apartments at 63 Chestnut (the "Renovated 63 Chestnut Apartment") to Ed Devaney once the repairs were complete.  Singh asked again, however, that, as a condition of providing the Renovated 63 Chestnut Apartment, Ed Devaney apply for rental assistance since he had not been able to pay his rent for the 65 Chestnut Apartment for twenty-one (21) months prior to the hurricane.

17

74.    In response, Tattoli stated only that he would attempt to have the past due rent paid to Plaintiffs.

75.    Tattoli never followed through on this representation.  In fact, as set forth below, the Weehawken Officials would subsequently try to force Plaintiffs to waive all past due rent owed by Ed Devaney.

76.    Immediately after Singh agreed to provide the Renovated 63 Chestnut Apartment to Ed Devaney, the apartments at 63 Chestnut were inspected by Masterson from the Building Department and, unsurprisingly, no violation was found.  Accordingly, Tattoli was forced to lift what was demonstrated to be a baseless Stop Work Order.

77.    In addition, now that Singh had agreed to provide the Renovated 63 Chestnut Apartment to Ed Devaney, Tattoli stated to Singh upon lifting the order that he would make sure that Masterson—who had been harassing and belligerent with Plaintiffs' tenants—would stop going to 63 Chestnut.

**VII.    SOON AFTER THE FIRST BASELESS STOP WORK ORDER IS LIFTED, THE WEEHAWKEN OFFICIALS BEGIN HARASSING, INTIMIDATING, AND RETALIATING AGAINST PLAINTIFFS FOR NOT IMMEDIATELY PROVIDING ED DEVANEY WITH THE RENOVATED 63 CHESTNUT APARTMENT**

78.    By the time the First Baseless Stop Work Order was lifted, the contractors who had been working on 63 Chestnut and 65 Chestnut had begun work on other construction projects.  Indeed, due to the devastation caused by the hurricane in the area, a delay of even one day would result in any contractor to move to another project in the area.  Moreover, due to the tremendous amount of remediation and repair work to be done on buildings that had been severely damaged by the hurricane throughout northern New Jersey, it was impossible to convince the contractors to return to the building before they had finished their new projects.

79.     Accordingly, as a direct result of the First Baseless Stop Work Order, no work was performed at 63 Chestnut or 65 Chestnut for approximately two months.

80.     However, throughout February 2013, the harassing telephone calls from the Weehawken Officials continued.  Over the course of three weeks, Singh received eight (8) calls demanding that the work on the 63 Renovated Chestnut Apartment be completed immediately.

81.     In early April 2013, Plaintiffs were finally able after considerable effort to convince the contractors to return to the project and resume work at 63 Chestnut and 65 Chestnut.  Due to the Weehawken Officials' harassment and continued threats, Plaintiffs were forced to pay all costs of construction at their own expense since they had still not received any insurance proceeds.

82.     At this point, Singh had been subject to such harassment and intimidation and was so fearful of further abuse of power by the Weehawken Officials that she made all conceivable efforts to complete the Renovated 63 Chestnut Apartment as quickly as possible.

83.     However, despite Singh's efforts, the Weehawken Officials' harassment and intimidation not only continued but escalated even more.  Indeed, the Weehawken Officials decided to begin harassing the Singhs' at their personal residence in addition to harassing, intimidating, and retaliating against Plaintiffs in connection with their rental properties.

84.     On or about April 5, 2013, Masterson went to the Singhs' personal residence, saw that Singh was building raised planting beds for the vegetables in her vegetable garden, and immediately ordered Singh to stop work.  Masterson told Singh that if she refused to stop work on her garden, a summons would be issued.  Singh thus was forced to stop all work in her garden.

85.     Singh was now not only being subjected to harassment, intimidation, and retaliation by Weehawken Officials in connection with Plaintiffs' business, but was being subjected to harassment, intimidation, and retaliation at the Singhs' personal residence.

86.     Singh, in shock and further intimidated by the thought of having the Weehawken Officials harassing and intimidating her at her home, immediately hand delivered a letter to Tattoli regarding Masterson's order to stop work on her garden.  With the letter, Singh also provided Tattoli with a printout from a gardening magazine explaining how raised planting beds made it easier for elderly and handicapped individuals to garden.

87.     Having received no response from Tattoli after a week, Singh called Tattoli and asked permission to plant seeds in her garden, which Tattoli granted.  Singh was now being forced to seek permission from the Weehawken Officials before she could garden in her back yard.

88.     At or around that same time, beginning in early April 2013, Singh also began receiving calls from Tattoli and other Weehawken Officials demanding that Singh provide them with keys to the Renovated 63 Chestnut Apartment for Ed Devaney.  Singh repeatedly responded that, because the First Baseless Stop Work Order had caused her contractors to leave the job for over two months, the apartment was not yet ready.  With each call, Tattoli and the other Weehawken Officials expressed displeasure and spoke in a threatening tone to further intimidate Singh.

89.     The calls continued over the course of several weeks.  In April 2013 alone, Singh received approximately twelve (12) calls from Tattoli and the Weehawken Officials.  Each time, Singh was told that Weehawken and the Weehawken Officials were demanding that she immediately provide Ed Devaney with the Renovated 63 Chestnut Apartment.

90.     These demands were so extreme that, during one of the telephone calls with Tattoli, after Singh indicated that she needed to obtain and submit paperwork to obtain permits and formal inspections to complete the work at 63 Chestnut (and to allow Ed Devaney to move into the Renovated 63 Chestnut Apartment), Tattoli retorted that Plaintiffs should just complete the work and worry about the necessary permits and formal inspections later.  Tattoli even stated that he would waive any fees related to permits and inspections as long as Ed Devaney was provided with the renovated apartment.

91.     At Tattoli's direction, and because she was intimidated and frightened by the Weehawken Officials' blatant abuse of power, Singh continued the work at 63 Chestnut.

92.     In late April/early May 2013, a building inspector from Tattoli's office inspected the work at 63 Chestnut and 65 Chestnut.  During the inspection, the inspector, yet again, berated Singh and told her to hurry completion of the apartment and to provide the keys to the Renovated 63 Chestnut Apartment to the Building Department as soon as possible.

93.     Over the course of the next week, Tattoli and other Weehawken Officials harassed Singh with another seven (7) calls regarding the status of the work on the Renovated 63 Chestnut Apartment.

94.     Then, on May 10, 2013, Singh received a call from Ahmad, who introduced himself as the Assistant Township Manager.  Ahmad chastised Singh for not yet having finished the renovations of the apartment at 63 Chestnut.  He also stated that Weehawken was "very upset" with her because she had failed to provide an apartment for Chris Devaney, Ed Devaney's brother.  In addition to being very intimidated and frightened by threats from a high-ranking official (the Weehawken Assistant Township Manager), Singh was confused since Chris

Devaney was not a tenant at the time of the hurricane and had voluntarily vacated his apartment years before, which she told Ahmad and Tattoli.

95.     The Weehawken Officials were now harassing and intimidating Singh to compel Plaintiffs to provide private housing for not one but two private individuals (Ed Devaney and Chris Devaney).  In a state of disbelief and helplessness, Singh stated that the apartment was not yet completed, that she needed to submit paperwork to the Building Department for inspections, and that the apartment needed to be inspected before anyone could move into it.

96.     The next day, Singh received yet another call from Tattoli, again demanding that Singh immediately finish the renovations at the apartment.

97.     A few days later, Tattoli and Ahmad both came to 63 Chestnut and visited the Renovated 63 Chestnut Apartment.  Tattoli yet again told Singh to finish the work, turn the keys over to him for Ed Devaney, and worry later about the permits and inspections she stated Plaintiffs needed to complete the work.  Singh explained that the apartment would be ready within two weeks.  Singh then provided Tattoli and Ahmad with a blank rental application to be completed by Ed Devaney for the Renovated 63 Chestnut Apartment.  Finally, Singh informed Tattoli and Ahmad that the persistent harassing and intimidating telephone calls from Tattoli and other Weehawken Officials over the last five months were becoming unbearable and preventing her from sleeping at night.   Tattoli and Ahmad ignored this, and reiterated their demand that Singh complete the renovations.

98.     Even though Singh had indicated to Tattoli and Ahmad that the Renovated 63 Chestnut Apartment would be ready within two weeks, the Weehawken Officials' abuse of power and egregious harassment and intimidation of Singh did not stop.  In fact, it got much worse.

99.     Over the course of the next few days, between May 13 and May 17, 2013 Singh received another four (4) harassing calls from Ahmad and other Weehawken officials.

100.    On May 17, 2013, Ahmad called Singh and informed her that he had Ed Devaney's completed application for the Renovated 63 Chestnut Apartment at his office at the Weehawken Town Hall.

101.    At Ahmad's request, Singh travelled to the Weehawken Town Hall and retrieved Ed Devaney's application from Ahmad.  However, upon her subsequent review of the application, Singh discovered that the application was practically entirely incomplete, and included no proof or statement of Ed Devaney's income.  Proof of Ed Devaney's income was particularly important since he had already failed to pay twenty-one (21) months of the $163 monthly rent for the 65 Chestnut Apartment and Singh needed to ensure that he could pay the rent for the renovated apartment before Plaintiffs could agree to provide the apartment to him – especially since the rent for the Renovated 63 Chestnut Apartment would be significantly higher than $163 per month.

102.    On May 20, 2013, after receiving another two (2) harassing calls from Tattoli and another Weehawken Official, Singh met with Tattoli at his office at the Weehawken Town Hall to discuss Ed Devaney's application.  Singh provided Tattoli with the incomplete application and stated that she needed proof of Ed Devaney's income.  She also reiterated that she believed Ed Devaney needed to obtain rental assistance because he had demonstrated that he could not pay the prior monthly rent of $163 for the 65 Chestnut Apartment that he had occupied.

103.    As if Singh were not already in a state of shock as a result of the Weehawken Officials' egregious abuse of power and the fact that she was negotiating a rental application of a private citizen for a privately-owned residence with a high-ranking Weehawken official at the

Weehawken Town Hall, Tattoli told Singh that the rent for the Renovated 63 Chestnut Apartment would be only $163 per month.  Since the fair market rental value of the Renovated 63 Chestnut Apartment was approximately $1,100 per month, Singh responded that this was impossible and would cause Plaintiffs significant financial burden.  Tattoli threatened that if Singh did not provide him with the keys to the apartment that same day (and thus acquiesce to the $163 per month rent), he would be out of the picture, and she would have to deal with even higher ranking Weehawken officials.  Feeling in a state of further shock, intimidated and understanding that she had no other recourse, Singh agreed to provide Tattoli with keys to the Renovated 63 Chestnut Apartment the next day, once the apartment had been painted and cleaned.  Singh asked, however, if the Weehawken Officials would agree to have Ed Devaney sign a lease for the Renovated 63 Chestnut Apartment prior to his taking possession.

104.    Later on May 20, 2013, Singh received three (3) telephone calls from the Weehawken Building Department.  In one of the three calls, the official merely told Singh in response to her request that Ed Devaney provide proof of income that Ed Devaney earned approximately $11,000 per year in cash as an independent mover.  There was no proof of income, however.  In the two other calls, the officials demanded the keys to the apartment.  Again, Singh requested that Ed Devaney seek any rental assistance, including Section 8 rental assistance, and reiterated that Plaintiffs could not rent the apartment at $163 per month, as Tattoli had demanded.

105.    Although the Weehawken Officials ignored and refused to abide by Singh's repeated requests to assist Ed Devaney in obtaining any type of rental assistance for the Renovated 63 Chestnut Apartment, Tattoli remarkably informed Singh at or around this time that Weehawken had been paying the rent for both Ed Devaney's and Chris Devaney's apartments

24

since they had moved out of the Sheraton.  Singh questioned how Weehawken could be paying this rent for Chris Devaney, whose income as the chef/manager at Houlihan's Restaurant in Weehawken was far too high to qualify for rental assistance.  Tattoli did not respond.

106.   The night of May 20, 2013, Singh received a fourth call, this time from Ahmad, who demanded that she provide him with the keys to the apartment.  Singh yet again stated that Ed Devaney owed Plaintiffs twenty-one (21) months of past rent and asked that he seek rental assistance, and yet again stated that Plaintiffs could not feasibly rent the apartment at $163 per month as it would cause Plaintiffs significant financial hardship.

107.   Singh's telephone call with Ahmad was her last with Weehawken or any Weehawken Official.  However, it was only the beginning of what amounted to a shocking display of abuse of power by Turner, Ahmad, Tattoli and the Township's attorney, Venino.

## VIII.  THE WEEHAWKEN OFFICIALS ISSUE A SECOND BASELESS STOP WORK ORDER TO FURTHER HARASS, INTIMIDATE, AND RETALIATE AGAINST PLAINTIFFS

108.   On May 21, 2013, as a result of Singh's refusal to provide the Renovated 63 Chestnut Apartment to Ed Devaney at a rent of $163 per month—as had been demanded by Tattoli and Ahmad—Tattoli issued a second arbitrary and entirely baseless Stop Construction Order (the "Second Baseless Stop Work Order"), again ordering that all construction at 63 Chestnut and 65 Chestnut immediately stop.  A true copy of the Second Baseless Stop Work Order is attached hereto as Exhibit B.

109.   The Second Baseless Stop Work Order cited a "FAILURE TO CALL FOR REQUIRED BUILDING AND ELECTRICAL INSPECTIONS," despite that Tattoli and Ahmad had repeatedly told Singh to complete all work and worry about permits and inspections after Ed Devaney was moved into the Renovated 63 Chestnut Apartment.

110.    Plaintiffs had now been issued a stop work order for having followed the instructions of Tattoli and Ahmad.

111.    Singh, in shock and confused, called Tattoli numerous times to obtain an explanation for the Second Baseless Stop Work Order.

112.    Tattoli never answered or called Singh back.

## IX.    PLAINTIFFS IMMEDIATELY APPEAL THE SECOND BASELESS STOP WORK ORDER

113.    On May 28, 2013, Plaintiffs, through an attorney, filed an appeal (the "Appeal") of the Second Baseless Stop Work Order with the Hudson County Construction Board of Appeals.  A true copy of the Appeal is attached hereto as Exhibit C.

114.     In their Appeal, Plaintiffs explained that, in response to their repeated requests for formal inspections of the work at 63 Chestnut and 65 Chestnut, Singh had been told by Tattoli to complete all work as quickly as possible and that formal inspection issues would be dealt with upon completion of the work.  Plaintiffs further stated that the Second Baseless Stop Work Order had been issued as retaliation for Singh's request that Ed Devaney seek rental assistance.   Accordingly, Plaintiffs requested a hearing to rescind the Second Baseless Stop Work Order and to permit a review by the Board for approval of certificates of occupancy for the renovated apartments at 63 Chestnut.  Finally, Plaintiffs also requested that Tattoli, who was the Chairman of the Hudson County Construction Board of Appeals, recuse himself since he had issued the stop work order being appealed and thus had a conflict of interest.

115.    On June 4, 2015, after Singh had still not heard anything from Tattoli or Ahmad regarding the Second Baseless Stop Work Order, Plaintiffs, through their attorney, sent a letter to Turner.  In the letter, Plaintiffs provided formal notice that any communications regarding 63 Chestnut or 65 Chestnut should be made to Plaintiffs' attorney.  Plaintiffs also recounted the

entire background of the Second Baseless Stop Work Order and set forth in detail the egregious conduct of the Weehawken Officials and the harassment, intimidation and retaliation Singh had endured over the last seven months, as well as the severe financial hardship Plaintiffs had endured as a result of being forced to repair and remediate the properties at their own expense. Finally, Plaintiffs requested that the Weehawken Officials cease harassing Singh.

116.    Turner did not respond to and ignored Plaintiffs' letter, despite the fact that the letter recounted in detail the egregiousness of the Weehawken Officials' abuse of power under color of law.   In fact, unbeknownst to Plaintiffs, Turner had been entirely complicit in and even directed the abuse of power engaged in by the Weehawken Officials.  This would be confirmed a few months later when Turner personally castigated and berated Plaintiffs' attorney for having allegedly missed a scheduled meeting with the Weehawken Officials to negotiate a use and occupancy agreement for Ed Devaney's use of the Renovated 63 Chestnut Apartment.

## X.    THE WEEHAWKEN OFFICIALS EXTORT AND FORCE PLAINTIFFS TO PROVIDE THE 63 CHESTNUT APARTMENT TO ED DEVANEY AT THE RATE OF ONLY $163 PER MONTH

117.    On June 11, 2013, Plaintiffs, through their attorney, were able to contact Ahmad to discuss the Second Baseless Stop Work Order.  During the discussion, Ahmad demanded that Plaintiffs send him a proposed use and occupancy agreement for the Renovated 63 Chestnut Apartment with a rental rate of $163 per month.

118.    Based on this conversation, it was made clear to Singh that the Second Baseless Stop Work Order had been issued by Weehawken and the Weehawken Officials as retaliation for Plaintiffs having refused to provide Ed Devaney with the Renovated 63 Chestnut Apartment at the rent of only $163 per month.  It was also clear to Singh that the Weehawken Officials would not lift the Second Baseless Stop Work Order and permit Plaintiffs to complete work at both 63

27

Chestnut and 65 Chestnut until Plaintiffs agreed to provide Ed Devaney with a newly renovated apartment at that monthly rate.

119.    Plaintiffs therefore had no choice but to agree to enter into a use and occupancy agreement with Weehawken for Ed Devaney at the rate of only $163 per month, even though the fair market rental value for the apartment was approximately $1,100 per month.  If Plaintiffs did not, they would never be able to complete work at the buildings, and would lose all income to be generated from rents in those buildings.

120.    The Weehawken Officials had successfully extorted Plaintiffs to agree to the rate of only $163 per month.

## XI.    THE WEEHAWKEN OFFICIALS PERSONALLY NEGOTIATE AND FORCE PLAINTIFFS TO ENTER INTO A USE AND OCCUPANCY AGREEMENT GRANTING ED DEVANEY POSSESSION OF THE RENOVATED 63 CHESTNUT APARTMENT

121.    On June 13, 2013, at Ahmad's request, Plaintiffs provided Ahmad with a proposed use and occupancy agreement (the "U&O Agreement").  True copies of a June 13, 2013 email and a June 13, 2013 letter from Plaintiffs' attorney to Ahmad attaching the draft U&O Agreement are attached hereto as Exhibit D.

122.    As demanded by Ahmad, the U&O Agreement required that Singh would provide the Renovated 63 Chestnut Apartment to Ed Devaney for only $163 per month.  The agreement would expire upon the earliest of the issuance of a Certificate of Occupancy for Ed Devaney's apartment at 65 Chestnut or a year after Ed Devaney moving into the Renovated 63 Chestnut Apartment.  If a Certificate of Occupancy was not issued for the 65 Chestnut Apartment within one year of the agreement, Ed Devaney would be required to vacate the Renovated Chestnut Apartment or pay the registered rent with capital improvement surcharges.  Finally, since Tattoli and Ahmad had forced Plaintiffs into entering into the agreement with Ed Devaney and had

dictated the material terms, Plaintiffs included Ahmad as a party to the U&O Agreement. This was especially important since Plaintiffs had not had any direct communications with Ed Devaney regarding the apartment or the agreement – rather, all of their communications had been through the Weehawken Officials.

123.     On June 17, 2013, Ahmad provided Plaintiffs' attorney with a revised draft of the U&O Agreement ("Weehawken's Revised U&O Agreement"), which included many material changes (the "Oppressive Provisions"). A true copy of a June 17, 2013 email from Ahmad to Plaintiffs' attorney attaching Weehawken's Revised U&O Agreement is attached hereto as Exhibit E.

124.     As set forth below, Plaintiffs would later find out that the changes in Weehawken's Revised U&O Agreement had been made by Venino, Weehawken's Law Director, and Ahmad.

125.     Among the Oppressive Provisions was a provision that Plaintiffs "release and hold [Ed Devaney] harmless from any claims that [Plaintiffs] may have against [Ed Devaney], whatsoever from the commencement of the relationship between the parties to the date of this agreement."

126.     With this provision, Ahmad and Venino were now unbelievably not only forcing Plaintiffs to provide the Renovated 63 Chestnut Apartment to Ed Devaney at an incredibly low $163 per month (even though the fair market rental value with capital improvement surcharges was approximately $1,100 per month), but they were trying to force Plaintiffs to give up their right to recover any of the twenty-one (21) months of past due rent owed to them by Ed Devaney. This was the first time the Weehawken Officials had made any mention of such a waiver, and Plaintiffs could not agree to it.

29

127.    In addition, Ahmad and Venino were requiring in Weehawken's Revised U&O Agreement that Plaintiffs expressly recognize Ed Devaney as a lawful tenant of the 65 Chestnut Apartment he had occupied, even though Ed Devaney had not been one (*i.e.* he had merely retained possession of his mother's apartment after her death).   Weehawken and Venino were thus forcing Plaintiffs to provide Ed Devaney with all rights as a legal tenant of 65 Chestnut, but, at the same time, to have provided him with a rent-free apartment for twenty-one (21) months. Again, Plaintiffs could not accept this.

128.    Finally, in Weehawken's Revised U&O Agreement, Venino and Ahmad removed Ahmad as a party to the agreement.   This was telling since, in doing so, Venino and Ahmad tacitly acknowledged that they were improperly negotiating an agreement on behalf of a private individual (Ed Devaney) with private landlords/owners (Plaintiffs) for a private residence (the Renovated 63 Chestnut Apartment) at a privately-owned building (63 Chestnut)—which received no public subsidy and was partially destroyed and rendered uninhabitable by an Act of God for which no insurance proceeds had yet been received—and, thus, could not and did not want it to be a party to the agreement.   Even though the Weehawken Officials had been actively harassing, intimidating, retaliating against, and extorting Plaintiffs over the course of seven months on behalf of Ed Devaney and Chris Devaney, they did not want to be formally linked to Ed Devaney's use and occupancy agreement in any way.

129.    A few days after Ahmad sent Weehawken's Revised U&O Agreement, Plaintiffs received notice that the hearing on their Appeal was scheduled for July 1, 2015.   The timing of the notice of the hearing was not coincidental, but was done to place further pressure on Plaintiffs to accept all of the Oppressive Provisions in Weehawken's Revised U&O Agreement prior to the hearing – otherwise, Plaintiffs' Appeal would be denied.

130.    On June 25, 2013, Plaintiffs, through their attorney, responded to Ahmad via email and objected to certain of Venino's and Ahmad's changes in Weehawken's Revised U&O Agreement, including the Oppressive Provisions. A true copy of a June 25, 2013 email from Plaintiffs' attorney to Ahmad is attached hereto as Exhibit F.

131.    Specifically, among other objections, Plaintiffs stated that Weehawken should be a party to the U&O Agreement, since Plaintiffs had not communicated in any manner with Ed Devaney regarding the agreement and since the Weehawken Officials were actively negotiating the terms of the agreement on his behalf. In addition, since Weehawken's, Venino's and Ahmad's request that Plaintiffs release their claims against Ed Devaney for the twenty-one (21) months' rent in arears seemed so egregious—and was yet another example of Weehawken's and the Weehawken Officials' blatant abuse of power—Plaintiffs requested that Ahmad confirm that Weehawken, in fact, was requesting that Plaintiffs waive said claims. Finally, because Plaintiffs knew that their Appeal would be denied at the scheduled July 1, 2013 hearing if the U&O Agreement was not finalized by then, Plaintiffs requested that Ahmad confirm with Tattoli that the hearing would be adjourned until the U&O Agreement was finalized.

132.    Ahmad never responded to Plaintiffs' objections.

133.    Instead, a few weeks later, Ahmad disclosed another official who would actively join in the harassment and intimidation of Plaintiffs – Venino, Weehawken's Law Director. On or about July 18, 2013, Ahmad informed Plaintiffs' attorney that Plaintiffs would now have to negotiate the terms of the agreement with Venino, who Ahmad identified as Weehawken's town attorney.

134.    Now, in addition to Tattoli (the head of Weehawken's Building Department), Masterson (a Weehawken building inspector), and Ahmad (Weehawken's Assistant Town

31

Manager), Weehawken had decided to place more pressure on Plaintiffs by disclosing the involvement of Weehawken's legal representative.

135.    On August 1, 2013, Plaintiffs were notified that their Appeal hearing had been scheduled for August 5, 2013, only four days later.  Again, the timing of this second late notice of the hearing was meant to provide pressure on Plaintiffs to sign the U&O Agreement with the Oppressive Provisions, to which Plaintiffs had strenuously objected.

136.    The hearing, however, was adjourned again without date, until August 29, 2013 when Plaintiffs were notified that the hearing would be held on September 9, 2013.  Again, Plaintiffs were deliberately provided with little to no advance notice of the hearing.  Moreover, by this point, Plaintiffs' Appeal had still not been heard, and all work at 63 Chestnut and 65 Chestnut had continued to be improperly halted by the Second Baseless Stop Work Order.  It was evident that the Weehawken Officials were improperly using the scheduling of the hearing of Plaintiffs' Appeal as leverage to put pressure on Plaintiffs to sign the U&O Agreement with the Oppressive Provisions.

137.    On September 10, 2013, after not having received any formal comments from Ahmad or Venino regarding Plaintiffs' objections to Venino's proposed changes in Weehawken's Revised U&O Agreement, Plaintiffs sent a revised draft of the agreement to Venino via email.  A true copy of a September 10, 2013 email from Plaintiffs' attorney to Venino is attached hereto as Exhibit G.  Among other things, Plaintiffs' revised draft of the U&O Agreement deleted Venino's and Ahmad's proposed language that Plaintiffs (i) recognize Ed Devaney as a lawful tenant of the 65 Chestnut Apartment he had occupied and (ii) release their claims against Ed Devaney for the twenty-one (21) months past rent due to Plaintiffs.  Plaintiffs

had already been extorted to concede to the $163 monthly rent; they could not agree to these additional provisions.

138.    Venino immediately responded the same day and rejected outright Plaintiffs' revised draft.  Specifically, Venino stated that all of the changes included in Weehawken's Revised U&O Agreement—which Venino admitted he had specifically made—were not included in Plaintiffs' revised draft.  Venino stated this was unacceptable, and suggested that Plaintiffs review his changes again and submit a revised draft incorporating those provisions.  In essence, Venino notified Plaintiffs that Weehawken would not negotiate the terms of the agreement, and that Plaintiffs had no choice but to accept the Oppressive Provisions.

139.    If Plaintiffs did not accept the Oppressive Provisions, the Second Baseless Stop Work Order would never be lifted – imposing upon Plaintiffs and particularly Singh, with enormous financial hardship.

140.    On September 23, 2013, in one last attempt to negotiate with Weehawken and avoid having to accept all of the Oppressive Provisions, Plaintiffs sent Venino and Ahmad another draft of the U&O Agreement via email.  A true copy of a September 23, 2013 email from Plaintiffs' attorney to Venino is attached hereto as Exhibit H.

141.    In the September 23, 2013 draft, Plaintiffs conceded to Venino's request that Plaintiffs recognize Ed Devaney as a lawful tenant of the 65 Chestnut Apartment.  Plaintiffs qualified this concession, however, and specified that they recognized Ed Devaney as the "only lawful tenant" of the 65 Chestnut Apartment (instead of "[a] lawful tenant" of the 65 Chestnut Apartment, which Venino and Ahmad had requested).   This distinction was critical to Plaintiffs because Venino's and Ahmad's language that Plaintiffs recognize Ed Devaney as "a lawful tenant" left the door open for Ed Devaney's brother, Chris Devaney, to also occupy the

apartment when it was finally renovated – something Plaintiffs did not want to accept.  Plaintiffs also added a provision by which they expressly retained their claim to seek the twenty-one (21) months of past due rent.

142.    In addition, Plaintiffs added provisions in the agreement that expressly conditioned Plaintiffs' obligation to provide Ed Devaney with the Renovated 63 Chestnut Apartment on the issuance of a Certificate of Occupancy for the two first floor apartments at 63 Chestnut.  Since the Weehawken Officials had demonstrated that they were willing to act in an entirely arbitrary and capricious manner when issuing stop work orders, Plaintiffs believed that this provision would prevent the Weehawken Officials from engaging in similar arbitrary and capricious conduct when issuing the necessary Certificate of Occupancy for 63 Chestnut.  As set forth below, Plaintiffs were wrong.

143.    In addition, since Plaintiffs' Appeal had, yet again, been adjourned—this time to October 7, 2013—Plaintiffs set a goal of finalizing the agreement by October 4, 2013, because they knew that if it was not finalized by then, their Appeal would be denied.  Finally, since Plaintiffs had still not met or spoken with Ed Devaney regarding the apartment or agreement— and had still only been communicating with the Weehawken Officials—Plaintiffs' attorney requested that he be able to meet with Ed Devaney prior to signing the U&O Agreement to ensure that Ed Devaney had read and understood its terms.

144.    On September 24, 2013, Venino responded (via email copying Ahmad) and, again, rejected outright Plaintiffs' proposed draft.  Venino attached a red-lined draft of the U&O Agreement showing Plaintiffs' changes, which he explained were unacceptable.  Specifically, Venino stated:

> Attached is a red-lined comparison of your last version with our version sent to you back in June.  I am at a loss to understand why none of our requested changes

has made the cut.  Essentially they are the items lined through on the attachment.
I would appreciate the reasoning on an item by item basis.

A true copy of a September 24, 2013 email from Venino to Plaintiffs' attorney is attached hereto
as Exhibit I.

145.    With his email, Venino made clear that Weehawken's Revised U&O Agreement
was a "take-it-or-leave-it" offer – and that if Plaintiffs refused to sign the agreement as proposed
by Venino, the Second Baseless Stop Work Order would not be lifted.

146.    Over the next few days, in a clear effort to oppress Plaintiffs even more and put
additional pressure on them to accept all of the Oppressive Provisions, Plaintiffs and their
attorney received harassing telephone calls from various Weehawken officials.

147.    On or about September 25, 2013, Tattoli—who was on the board scheduled to
hear Plaintiffs' Appeal—personally contacted Plaintiffs' attorney and indicated in no uncertain
terms that Plaintiffs should settle their issues with Weehawken before the October 7, 2013
hearing on Plaintiffs' Appeal.  Tattoli's recommendation was a not-so-subtle threat to Plaintiffs
that if they did not sign the agreement with the Oppressive Provisions, their Appeal would be
denied at the hearing.

148.    On or about that same day, Ahmad called Singh and told her that Weehawken was
very upset with her due to her failure to provide Ed Devaney with housing as the Weehawken
Officials had requested.   In making this telephone call, Ahmad knowingly and deliberately
ignored Plaintiffs' prior request in their letter to Turner that all communications be made through
Plaintiffs' attorney.

149.    Finally, in or around that time, Venino also called Plaintiffs' attorney and accused
him of failing to attend a purported meeting to discuss the U&O Agreement.  Plaintiffs' attorney
had not attended the meeting because he had not been given notice of said meeting by any

Weehawken official.  To further intimidate Plaintiffs, Turner then got on the telephone and personally berated Plaintiffs' attorney at length for missing the meeting.

150.    By personally berating Plaintiffs' attorney, Turner demonstrated that he not only was aware of the Weehawken Officials' egregious abuse of power in harassing, intimidating, retaliating against, and extorting Plaintiffs, but was complicit in and condoned their conduct.

151.    On September 25, 2013, Plaintiffs' attorney attempted to schedule a meeting with Venino and Ed Devaney to review the U&O Agreement in order to ensure that Ed Devaney understood its terms.  Plaintiffs' attorney also informed Venino that Tattoli had called him and indicated that Plaintiffs should try to finalize the U&O Agreement by the scheduled October 7, 2013 hearing on Plaintiffs' Appeal.  A true copy of a September 25, 2013 email from Plaintiffs' attorney to Venino is attached hereto as Exhibit J.  Venino did not respond to the email.

152.    On September 26, 2013, Plaintiffs' attorney again requested that Venino schedule a meeting with Ed Devaney to finalize the U&O Agreement.  This time, Venino responded, but refused to schedule the meeting because Plaintiffs had refused to accept the Oppressive Provisions.  Specifically, in a September 27, 2013 email to Plaintiffs' attorney, which Venino also sent to Ahmad, Venino stated:

> At this point, before sitting down, we're looking for your written comments to understand your client's refusal to accept the changes we sent you back in June – per the attached and my email (below) from Tuesday, September 24.

A true copy of a September 27, 2013 email from Venino to Plaintiffs' attorney is attached hereto as Exhibit K.

153.    Plaintiffs' attorney immediately responded to Venino and stated that he hoped there was "no confusion" as to Plaintiffs' proposed changes and attached another version of Plaintiffs' proposed U&O Agreement.  Plaintiffs' attorney also asked that Venino reconsider

36

Venino's refusal to schedule a meeting with Ed Devaney and reiterated his request that he be able to meet with Ed Devaney prior to execution of the U&O Agreement.  A true copy of a September 27, 2013 email from Plaintiffs' attorney to Venino is attached hereto as Exhibit L.

154.    Venino again refused to schedule any meeting because Plaintiffs had not accepted all of the Oppressive Provisions.  Specifically, in a second September 27, 2013 email to Plaintiffs' attorney, which Venino also sent to Ahmad, Venino retorted:

> No confusion.  That's the version that inexplicably contained none of our [Weehawken's] requested changes.

A true copy of a September 27, 2013 email from Venino to Plaintiffs' attorney is attached hereto as Exhibit M.

155.    On September 28, 2013, after Venino had made clear that Plaintiffs had to accept the Oppressive Provisions, Plaintiffs, through their attorney, provided Venino with a written, substantive explanation for each of Plaintiffs' changes, including the reasons for their refusal to accept the Oppressive Provisions.  A true copy of a September 28, 2013 email from Plaintiffs' attorney to Venino attaching a September 30, 2013 letter from Plaintiffs' attorney to Venino is attached hereto as Exhibit N.

156.    Consistent with the rampant abuse of power over the course of the previous eleven months, Venino essentially ignored Plaintiffs' explanations and responded via email, which Venino also sent to Ahmad:

> I reviewed your letter, but you did not address several changes I made to your original draft – back in June.

A true copy of a September 30, 2013 email from Venino to Plaintiffs' attorney is attached hereto as Exhibit O.

157.    On or about October 3, 2013, after Plaintiffs' repeated pleas that, at the very minimum, they not be forced to waive their claims to the twenty-one (21) months past rent due to them for the 65 Chestnut Apartment, Venino and Ahmad finally agreed to include Plaintiffs' proposed provision providing same.  Venino and Ahmad also agreed to allow Plaintiffs' qualifying language that Ed Devaney was the "only" lawful tenant of 65 Chestnut, and allowed Plaintiffs' language that the obligation to provide Ed Devaney with an apartment was conditioned upon the issuance of a Certificate of Occupancy for 63 Chestnut.

158.    However, as set forth below, all three of Venino's and Ahmad's concessions were hollow victories.  Plaintiffs would never actually be able to assert a claim for past rent due to the persistent and continuing threat of harassment, intimidation and retaliation by the Weehawken Officials – in fact, as set forth below, to this day, Plaintiffs have not sought to enforce that claim for that reason.  In addition, notwithstanding the language that Ed Devaney was the "only" lawful tenant of the 65 Chestnut Apartment, the Weehawken Officials would later make clear to Plaintiffs that they would be forced to allow Chris Devaney to live with Ed Devaney in whichever apartment Ed Devaney occupied in Plaintiffs' buildings.  Finally, although the U&O Agreement expressly conditioned Plaintiffs' obligation to provide Ed Devaney with the Renovated 63 Chestnut Apartment on the issuance of a Certificate of Occupancy, to this day, no Certificate of Occupancy has been issued for 63 Chestnut even though Ed Devaney occupies the Renovated 63 Chestnut Apartment.

159.    Later on October 3, 2013, after eleven months of incessant harassment, intimidation, retaliation, and extortion by Turner, Tattoli, Ahmad, Venino and Masterson, Plaintiffs finally capitulated and signed the U&O Agreement – giving access to the Renovated 63 Chestnut Apartment to Ed Devaney for only $163 per month, and recognizing that Ed Devaney

had been a lawful tenant of the 65 Chestnut Apartment.  A true copy of the executed U&O Agreement, dated October 3, 2013, is attached hereto as Exhibit P.

160.    As a final demonstration of their abuse of power and to further intimidate Plaintiffs, the Weehawken Officials forced Plaintiffs to sign the U&O Agreement at the Weehawken Town Hall, with Venino and Ahmad present and directly outside of Turner's office.

161.    Incredibly, Venino, the Weehawken town attorney, also signed the U&O Agreement as a witness for Ed Devaney.

162.    Ed Devaney was also present to sign the U&O Agreement.  It was the first time that Plaintiffs spoke with or dealt directly with Ed Devaney in connection with the remediation of 65 Chestnut, the Renovated 63 Chestnut Apartment, or the U&O Agreement.

## XII.  ONLY DAYS AFTER PLAINTIFFS CAPITULATE AND EXECUTE THE U&O AGREEMENT, THE SECOND BASELESS STOP WORK ORDER IS LIFTED EVEN THOUGH PLAINTIFFS NEVER ADDRESSED ANY OF THE PURPORTED INFRACTIONS IDENTIFIED IN THE ORDER

163.    On October 7, 2013, Tattoli sent a letter to the Hudson County Construction Board of Appeals.  In his letter, Tattoli requested a postponement of Plaintiff's Appeal hearing on the grounds that Plaintiffs had addressed the purported violations identified in the Second Baseless Stop Work Order.  A true copy of an October 7, 2013 letter from Ahmad to the Hudson County Construction Board of Appeals is attached hereto as Exhibit Q.

164.     In his October 7, 2013 letter, Tattoli specifically represented that "[63-65 Chestnut] has submitted additional information for the issued violations at this time."  This representation was false.

165.    Plaintiffs had not submitted any additional information regarding the purported violations in the Second Baseless Stop Work Order.  In fact, Plaintiffs had not done anything to

address the purported violations – the only thing Plaintiffs had done was sign the U&O
Agreement.

166.    Tattoli's October 7, 2013 letter to the Hudson County Construction Board of
Appeals proved that the only reason the First Baseless Stop Work Order and Second Baseless
Stop Work Order were issued was to harass, intimidate, retaliate against, and extort Plaintiffs to
succumb to the Weehawken Officials' unlawful demands that Plaintiffs provide Ed Devaney
with what was essentially a rent-free renovated apartment.

167.    On or about the same day Tattoli sent his October 7, 2013 letter, Tattoli lifted the
Second Baseless Stop Work Order, even though Plaintiffs had done nothing to address the
purported violations identified in the order.

168.    The Weehawken Officials had now issued two stop work orders at 63 Chestnut
and 65 Chestnut that they subsequently lifted even though Plaintiffs had done nothing to address
the purported violations in the orders – demonstrating the utter arbitrary and capricious nature of
the orders.

## XIII.  THE WEEHAWKEN OFFICIALS FORCE PLAINTIFFS TO GIVE THEM THE KEYS TO THE RENOVATED 63 CHESTNUT APARTMENT AND ALLOW ED DEVANEY TO MOVE INTO THE APARTMENT EVEN THOUGH NO CERTIFICATE OF OCCUPANCY IS ISSUED FOR 63 CHESTNUT

169.    After the Second Baseless Stop Work Order was lifted, Plaintiffs were able to
complete the repairs and renovations of the apartments at 63 Chestnut, including the Renovated
63 Chestnut Apartment.

170.    Plaintiffs thereafter requested a Certificate of Occupancy for 63 Chestnut.

171.    As had been requested by Plaintiffs, the U&O Agreement specifically provided
that Plaintiffs were obligated to provide Ed Devaney with the Renovated 63 Chestnut Apartment

only "[u]pon the issuance of a Certificate of Occupancy by the Township of Weehawken" for 63 Chestnut.

172.    However, Weehawken did not issue a Certificate of Occupancy, through no fault of Plaintiffs.

173.    On October 24, 2013, Tattoli nonetheless demanded that Plaintiffs provide the keys to the Renovated 63 Chestnut Apartment for Ed Devaney.  Plaintiffs reluctantly complied and provided the keys to Brian Hernandez, a Weehawken employee, who came to pick them up at the Singhs' home.

174.    On October 25, 2013, Ed Devaney moved into the Renovated 63 Chestnut Apartment.  Again, no Certificate of Occupancy had been issued.

175.    That the Weehawken Officials had completely ignored their primary obligation in the U&O Agreement to issue a Certificate of Occupancy prior to Ed Devaney taking possession of the apartment demonstrated that the they never intended to abide by that provision of the U&O Agreement and would ignore and breach every provision in the agreement that was not favorable to them or Ed Devaney.  This included the provision that Plaintiffs reserved their claim to the twenty-one (21) months past due rent for the 65 Chestnut Apartment.

## XIV.   ED DEVANEY BREACHES THE U&O AGREEMENT IMMEDIATELY UPON MOVING INTO THE RENOVATED 63 CHESTNUT APARTMENT

176.    The U&O Agreement also specifically provided that Ed Devaney was to be the only resident in the Renovated 63 Chestnut Apartment:

> [t]he Occupant [of the Renovated 63 Chestnut Apartment] only consists of Mr. Edward Devaney and no others . . . Violation of this will constitute a material breach and this agreement will be terminated.

As set forth above, this provision was important to Plaintiffs since they did not want Chris Devaney, Ed Devaney's brother, to also live in the apartment.

41

177.    However, immediately after Ed Devaney took possession of the apartment, he allowed Chris Devaney to move into the apartment, and has allowed Chris Devaney and Chris Devaney's son to continue to live in the apartment since.

178.    While this was and continues to be a material breach of the U&O Agreement, Plaintiffs have not sought to evict either Ed Devaney or Chris Devaney from the Renovated 63 Chestnut Apartment for fear of further harassment, intimidation, and/or retaliation from the Weehawken Officials.

179.    Indeed, the Weehawken Officials had not only displayed an egregious abuse of power over the course of the past eleven months due to their personal interest in ensuring that Ed Devaney and Chris Devaney be provided with private housing, but also demonstrated that they would not comply with—or have Ed Devaney comply with—any provision in the U&O Agreement that was not favorable to them or Ed Devaney.

180.    In addition, after Ed Devaney moved into the Renovated 63 Chestnut Apartment, the Weehawken Officials made sure to impress upon Plaintiffs that they would continue to ensure that Ed Devaney and Chris Devaney be provided with an apartment.  Indeed, police officers and other Weehawken Officials have regularly continued to park their vehicles in front of 63 Chestnut to socialize with Ed Devaney and Chris Devaney.

181.    Finally, as set forth above, Tattoli had told Singh that Weehawken paid for Ed Devaney's and Chris Devaney's housing (purportedly with taxpayer funds) from December 2012 (when Ed Devaney and Chris Devaney were forced to move out of the Sheraton) until they moved into the Renovated 63 Chestnut Apartment – demonstrating that the Weehawken Officials were able and willing to engage in whatever egregious abuse of power they deemed necessary to

ensure that Ed Devaney and Chris Devaney continued to have a residence at little to no cost to them.

182.    This also demonstrated that the Weehawken Officials were willing and able—and in fact did—used significant Weehawken resources and funds to further the interests of Ed Devaney and Chris Devaney, two private individuals who happened to be friends and family members of Weehawken officials.

183.    For these reasons, Plaintiffs have been forced to allow Ed Devaney and Chris Devaney to continue to live in the Renovated 63 Chestnut Apartment, even though Ed Devaney has breached, and continues to breach, the U&O Agreement.  Plaintiffs have also been forced to refrain from asserting a claim against Ed Devaney for the twenty-one months past rent due to them for the 65 Chestnut Apartment, or from asserting a claim against Chris Devaney for the twelve (12) months past rent due to them for the 63 Chestnut apartment he had previously occupied.

184.    Finally, Plaintiffs have been forced to allow Ed Devaney to occupy the Renovated 63 Chestnut Apartment even though no Certificate of Occupancy has been issued, over a year-and-a-half after he moved into the apartment – which, aside from being further abuse, demonstrates the complete arbitrary and capricious manner in which the Weehawken Officials issue and enforce permits and certificates in connection with Plaintiffs.

## XV.    THE WEEHAWKEN OFFICIALS HAVE CONTINUED TO HARASS, INTIMIDATE, RETALIATE AGAINST, AND EXTORT PLAINTIFFS SINCE ED DEVANEY MOVED INTO THE RENOVATED 63 CHESTNUT APARTMENT

185.    Due to the extreme financial hardship suffered by Plaintiffs as a result of (i) being forced by the Weehawken Officials to perform renovation and repair work at 63 Chestnut and 65 Chestnut prior to having received any insurance proceeds and (ii) losing significant rental

income as a result of the baseless stop work orders, foregoing the past due rent, and receiving only $163 per month for the Renovated 63 Chestnut Apartment, Plaintiffs have been unable to complete any additional remediation and repair work on the 65 Chestnut Apartment.

186.    As such, the 65 Chestnut Apartment remains in an uninhabitable state.

187.    On July 9, 2014, however, the New Jersey Department of Community Affairs (the "DCA") conducted a five-year State housing inspection of 63 Chestnut and 65 Chestnut.

188.    The DCA inspection was performed by the Weehawken Building Department, and specifically, Masterson.

189.    Upon completion of the inspection, Masterson provided Plaintiffs with his Inspector Report, which incredibly listed fifty-nine (59) separate violations.

190.    A brief review of the listed violations showed that they were reported by Masterson solely to harass, intimidate, and retaliate against Plaintiffs for having refused to provide Ed Devaney with a residence after Hurricane Sandy.  The violations were also clearly reported to further extort Plaintiffs into continuing to provide Ed Devaney with the newly renovated apartment with a market value of $1,100 per month at a rate of $163 per month, to refrain from evicting Ed Devaney for breaching the U&O Agreement, and to refrain from asserting a claim for the past rent due against Ed Devaney and Chris Devaney.

191.    Indeed, among the preposterous repairs required by Masterson was that Plaintiffs paint the entire 65 Chestnut Apartment and install a door viewer and chain guard on the front door.  However, the 65 Chestnut Apartment was, and still is, in an obvious state of construction/demolition, which Masterson knew and observed when he performed the inspection. Masterson also requested that Plaintiffs repair the siding on the rear of 63 Chestnut and 65

Chestnut even though there is no siding on the rear of the buildings; rather, there is stucco that is in excellent condition in no need of repair.

192.    Finally, while Masterson purportedly found fifty-nine (59) violations throughout 63 Chestnut and 65 Chestnut, he did not note one violation in the Renovated 63 Chestnut Apartment occupied by Ed Devaney and Chris Devaney.

193.    Despite the obvious harassing nature of Masterson's Inspection Report, Plaintiffs worked to address each of the violations.

194.    On March 6, 2015, Masterson completed a re-inspection of the buildings, and confirmed that Plaintiffs had completed repair work for fifty-seven (57) of the fifty-nine (59) purported violations, and that Plaintiffs were working on repairs for the last two (2) of the purported violations.

195.    Masterson's conduct in connection with the recent DCA five-year housing inspection is evidence that the Weehawken Officials are continuing and intend to continue to harass, intimidate, retaliate against, and extort Plaintiffs.

196.    As a result of the Weehawken Officials' coordinated pattern of harassment, intimidation, retaliation, extortion, and egregious abuse of power, under color of law, Plaintiffs have suffered extensive monetary and other damages.  Among other things, Plaintiffs were forced to (i) allow Ed Devaney to remain in the 65 Chestnut Apartment for approximately four years at a staggeringly low rent of $163 per month; (ii) refrain from asserting a claim for twenty-one (21) months of past due rent owed by Ed Devaney for the 65 Chestnut Apartment; (iii) refrain from asserting a claim for twelve (12) months of past due rent owed by Chris Devaney for the apartment he occupied at 63 Chestnut; (iv) provide the Renovated 63 Chestnut Apartment to Ed Devaney at a rate of only $163 per month, even though the fair market rental value for the

apartment is approximately $1,100 per month; (v) incur substantial costs in renovating and repairing 63 Chestnut and 65 Chestnut even though they had not received any insurance proceeds; (vi) lose rental income in connection with the 65 Chestnut Apartment as a result of Plaintiffs inability to finish repairs in the apartment; and (vii) incur losses of rental income for approximately seven months as a result of the First Baseless Stop Work Order and the Second Baseless Stop Work Order. Plaintiffs have additionally suffered extreme mental anguish as a result of the Weehawken Officials' wrongful conduct.

**COUNT ONE**
**DEPRIVATION OF SUBSTANTIVE DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against the Weehawken Officials in their Individual Capacities)**

197.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

198.    Plaintiffs have the right to substantive due process, guaranteed under the Fourteenth Amendment of the United States Constitution, not to be deprived of their constitutionally protected property interests and liberties and to be free from the deliberate and arbitrary abuse of government power.

199.    The Weehawken Officials have arbitrarily and capriciously interfered with Plaintiffs' constitutionally protected property interests and right to operate a business and engage in the livelihood of Plaintiffs' choice since November 2012. The Weehawken Officials have also engaged in a deliberate and arbitrary abuse of government power with no rational or legitimate basis.

200.    The Weehawken Officials' conduct set forth above was part of an ongoing campaign of harassment, intimidation, and retaliation to deprive Plaintiffs of their property and

46

liberty interests, as guaranteed by the Fourteenth Amendment of the United States Constitution, specifically, among other things, their right to be free to pursue an occupation without undue government interference, and their right to utilize their property.

201.     Furthermore, the Weehawken Officials' conduct was arbitrary and capricious and did not bear any substantial, rational or compelling relation to the administration and/or management of Weehawken or their relative governmental duties.

202.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to provide Ed Devaney with housing in the Renovated 63 Chestnut Apartment at a rate of only $163 per month.

203.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to begin, and continue to perform, work on 63 Chestnut and 65 Chestnut even though Plaintiffs had not received any insurance proceeds.

204.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously issued, without regard to due process, the First Baseless Stop Work Order and the Second Baseless Stop Work Order, thereby forcing Plaintiffs to stop all work at 63 Chestnut and 65 Chestnut.

205.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously issued, without regard to due process, the stop work order at the Singhs' personal residence.

206.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously refused, without regard to due process, to lift the Second Baseless Stop Work Order until Plaintiffs executed the U&O Agreement.

207.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to execute the U&O Agreement.

208.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to recognize Ed Devaney as a lawful tenant of the 65 Chestnut Apartment.

209.     The Weehawken Officials, acting under color of law, have deliberately, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to refrain from evicting Ed Devaney from the Renovated 63 Chestnut Apartment even though he breached the U&O Agreement.

210.     The Weehawken Officials, acting under color of law, have deliberately, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to refrain from asserting a claim against Ed Devaney for the twenty-one (21) months past due rent owed to them for the 65 Chestnut Apartment.

211.     The Weehawken Officials, acting under color of law, have deliberately, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to refrain from asserting a claim against Chris Devaney for the twelve (12) months past due rent owed to them for the 63 Chestnut apartment Chris Devaney previously occupied.

212.     The Weehawken Officials, acting under color of law, deliberately, arbitrarily and capriciously issued, without regard to due process, an Inspector Report listing fifty-nine (59) separate violations at Plaintiffs' buildings.

213.     In doing all of these things, the Weehawken Officials knew, or should have known, that they were violating Plaintiffs' established constitutional rights to substantive due

process, and it was not objectively reasonable for the Weehawken Officials to believe that their conduct did not violate Plaintiffs' established constitutional rights to substantive due process.

214.    The Weehawken Officials' conduct set forth above constitutes a deliberate, egregious and arbitrary abuse of government power that shocks the conscience.

215.    As such, by the aforementioned conduct, the Weehawken Officials denied and continue to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

216.    As a direct and proximate result of the Weehawken Officials' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.  In addition, the Weehawken Officials' actions as alleged herein were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT TWO**
**DEPRIVATION OF SUBSTANTIVE DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**<u>(Against Weehawken)</u>**

217.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

218.    Turner, Tattoli, Ahmad, and Venino, as the Mayor of Weehawken, the Construction Official of Weehawken, the Assistant Township Manager of Weehawken, and the Law Director of Weehawken, respectively, are individuals who have final policymaking authority with regard to the management and operation of Weehawken, including the Building Department and Public Works Department, rendering their conduct acts of official government policy of Weehawken.

219.    Weehawken, through Turner, Tattoli, Ahmad, and Venino, has persistently ratified the deprivation of substantive due process by the Weehawken Officials set forth above.

220.    In addition, despite having knowledge of the Weehawken Officials' repeated unlawful conduct, Weehawken, through Turner, Tattoli, Ahmad, and Venino, intentionally and knowingly failed to take affirmative action to stop such unlawful conduct.  Weehawken, through Turner, Tattoli, Ahmad, and Venino, also intentionally and knowingly failed to supervise, control and/or discipline the Weehawken Officials who engaged in the unlawful conduct in the performance of their official duties.

221.    In addition, Turner, Tattoli, Ahmad, and Venino have affirmatively participated in and directed the unconstitutional conduct set forth above.

222.    As such, by the aforementioned conduct, Weehawken denied and continues to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

223.    As a direct and proximate result of Weehawken's unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.

**COUNT THREE**
**DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against the Weehawken Officials in their Individual Capacities)**

224.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

225.    Plaintiffs have the right to procedural due process, guaranteed under the Fourteenth Amendment of the United States Constitution.

226.     The Weehawken Officials have arbitrarily and capriciously interfered with Plaintiffs' constitutionally protected right to procedural due process by depriving Plaintiffs of their liberty and property interests without one of the fundamental elements of procedural due process, *i.e.* the opportunity to be heard.

227.     Furthermore, the Weehawken Officials' conduct was arbitrary and capricious and did not bear any substantial, rational or compelling relation to the administration and/or management of Weehawken or their relative governmental duties.

228.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to provide Ed Devaney with housing in the Renovated 63 Chestnut Apartment at a rate of only $163 per month.

229.     The Weehawken Officials, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously issued, without regard to due process, the First Baseless Stop Work Order and the Second Baseless Stop Work Order.

230.     As set forth above, the Weehawken Officials had no legitimate or rational basis to issue the First Baseless Stop Work Order or the Second Baseless Stop Work Order.

231.     The Weehawken Defendants then deliberately acted to prevent and impede Plaintiffs from seeking relief from the Second Baseless Stop Work Order via the established appeal process with the Hudson County Construction Board of Appeals.

232.     Specifically, after the Second Baseless Stop Work Order was issued on May 21, 2013, Plaintiffs immediately filed an Appeal with the Hudson County Construction Board of Appeals on May 28, 2013.

233.     However, the Weehawken Officials deliberately prevented Plaintiffs' Appeal to be heard by the Hudson County Construction Board of Appeals by repeatedly postponing the

hearing on Plaintiffs' Appeal in order to force Plaintiffs to execute the U&O Agreement.

234. The Weehawken Officials also deliberately prevented Plaintiffs' Appeal to be heard by the Hudson County Construction Board of Appeals by repeatedly making clear that if Plaintiffs' did not execute the U&O Agreement prior to the hearing, Plaintiffs' Appeal would be denied.

235. Finally, the Weehawken Officials refused to have Tattoli recuse himself from the Hudson County Construction Board Of Appeals, as requested by Plaintiffs, even though Tattoli had issued the Second Baseless Stop Order being appealed and, thus, had a known conflict of interest.

236. As a result of the Weehawken Officials' deliberate, unreasonable, arbitrary and capricious conduct, Plaintiffs were denied the opportunity to have their Appeal heard by the Hudson County Construction Board of Appeals.

237. By deliberately, unreasonably, arbitrarily and capriciously engaging in the aforementioned conduct, the Weehawken Officials knew, or should have known, that they were violating Plaintiffs' established constitutional rights by denying Plaintiffs one of the fundamental elements of procedural due process, and it was not objectively reasonable for the Weehawken Officials to believe that their conduct did not violate Plaintiffs' established constitutional rights to procedural due process.

238. The Weehawken Officials' conduct was random and unauthorized and had no legitimate or rational basis.

239. As such, by the aforementioned conduct, the Weehawken Officials denied and continue to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

52

240.     As a direct and proximate result of the Weehawken Officials' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.  In addition, the Weehawken Officials' actions as alleged herein were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

## COUNT FOUR
## DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
## (42 U.S.C. § 1983)
## (Against Weehawken)

241.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

242.     Turner, Tattoli, Ahmad, and Venino, as the Mayor of Weehawken, the Construction Official of Weehawken, the Assistant Township Manager of Weehawken, and the Law Director of Weehawken, respectively, are individuals who have final policymaking authority with regard to the management and operation of Weehawken, including the Building Department and Public Works Department, rendering their conduct acts of official government policy of Weehawken.

243.     Weehawken, through Turner, Tattoli, Ahmad, and Venino, has persistently ratified the deprivation of procedural due process by the Weehawken Officials set forth above.

244.     In addition, despite having knowledge of the Weehawken Officials' repeated unlawful conduct, Weehawken, through Turner, Tattoli, Ahmad, and Venino, intentionally and knowingly failed to take affirmative action to stop such unlawful conduct.  Weehawken, through Turner, Tattoli, Ahmad, and Venino, also intentionally and knowingly failed to supervise,

control and/or discipline the Weehawken Officials who engaged in the unlawful conduct in the performance of their official duties.

245.    In addition, Turner, Tattoli, Ahmad, and Venino have affirmatively participated in and directed the unconstitutional conduct set forth above.

246.    As such, by the aforementioned conduct, Weehawken denied and continues to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

247.    As a direct and proximate result of Weehawken's unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.

**COUNT FIVE**
**CONSPIRACY TO DEPRIVE DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against the Weehawken Officials in their Individual Capacities)**

248.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

249.    Since November 2012 and continuing through October 2013, the Weehawken Officials agreed to, and in fact conspired to, engage in a collective campaign of harassment and intimidation to deprive Plaintiffs of their property and liberty interests, as guaranteed by the Fourteenth Amendment of the United States Constitution, and to coerce Plaintiffs to agree to sign the U&O Agreement and to provide Ed Devaney with the Renovated 63 Chestnut Apartment at a rate of only $163 per month.

250.    The Weehawken Officials also agreed to, and in fact conspired, to continue to engage in a collective campaign of harassment and intimidation to deprive Plaintiffs of their

property and liberty interests, as guaranteed by the Fourteenth Amendment of the United States Constitution, after Plaintiffs succumbed to the Weehawken Officials' harassment, intimidation, retaliation, and extortion and executed the U&O Agreement.

251.    As set forth above, the Weehawken Officials' conduct was arbitrary and capricious and did not bear any substantial, rational or compelling relation to the administration and/or management of Weehawken or their relative governmental duties.

252.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to provide Ed Devaney with housing in the Renovated 63 Chestnut Apartment at a rate of only $163 per month.

253.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to begin, and continue to perform, work on 63 Chestnut and 65 Chestnut even though Plaintiffs had not received any insurance proceeds.

254.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously issued, without regard to due process, the First Baseless Stop Work Order and the Second Baseless Stop Work Order, thereby forcing Plaintiffs to stop all work at 63 Chestnut and 65 Chestnut.

255.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously issued, without regard to due process, the stop work order at the Singhs' personal residence.

256.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously refused, without regard to due process, to

lift the Second Baseless Stop Work Order until Plaintiffs executed the U&O Agreement.

257.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to execute the U&O Agreement.

258.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, unreasonably, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to recognize Ed Devaney as a lawful tenant of the 65 Chestnut Apartment.

259.    The Weehawken Officials, in concert with each other, acting under color of law, have deliberately, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to refrain from evicting Ed Devaney from the Renovated 63 Chestnut Apartment even though he breached the U&O Agreement.

260.    The Weehawken Officials, in concert with each other, acting under color of law, have deliberately, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to refrain from asserting a claim against Ed Devaney for the twenty-one (21) months past due rent owed to them for the 65 Chestnut Apartment.

261.    The Weehawken Officials, in concert with each other, acting under color of law, have deliberately, arbitrarily and capriciously forced Plaintiffs, without regard to due process, to refrain from asserting a claim against Chris Devaney for the twelve (12) months past due rent owed to them for the 63 Chestnut apartment Chris Devaney previously occupied.

262.    The Weehawken Officials, in concert with each other, acting under color of law, deliberately, arbitrarily and capriciously issued, without regard to due process, an Inspector Report listing fifty-nine (59) separate violations at Plaintiffs' buildings.

263.    Finally, the Weehawken Officials, in concert with each other, acting under color

of law, deliberately, unreasonably, arbitrarily and capriciously denied Plaintiffs the opportunity to have their Appeal heard by the Hudson County Construction Board of Appeals.

264.    In doing all of these things, the Weehawken Officials knew, or should have known, that they were violating Plaintiffs' established constitutional rights, and it was not objectively reasonable for the Weehawken Officials to believe that their conduct did not violate Plaintiffs' established constitutional rights.

265.    The Weehawken Officials' conduct set forth herein constitutes such egregious abuse of power that it shocks the conscience.

266.    As such, by the aforementioned conduct, the Weehawken Officials, in concert with each other, denied and continue to deny Plaintiffs their rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

267.    As a direct and proximate result of the Weehawken Officials' unlawful conduct described above, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.  In addition, the Weehawken Officials' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT SIX**
**DEPRIVATION OF EQUAL PROTECTION UNDER THE FOURTEENTH**
**AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**
**(Against the Weehawken Officials in their Individual Capacities)**

268.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

269.    Plaintiffs have the right to equal protection of the law, guaranteed by the

57

Fourteenth Amendment of the United States Constitution, not to be deprived of their constitutionally protected liberty and property interests.

270.    The Weehawken Officials, acting under the color of New Jersey law, deliberately and willfully infringed upon Plaintiffs' constitutional rights to equal protection under the Fourteenth Amendment of the United States Constitution.

271.    The Weehawken Officials intentionally targeted Plaintiffs, treating them differently from other similarly situated owners of property neighboring Plaintiffs' properties by operating Weehawken's Building Department and Public Works Department in a deliberate, unjustifiable, arbitrary and discriminatory manner, in an attempt to unlawfully limit, interfere with and otherwise deprive Plaintiffs of their constitutionally protected liberty and property interests.

272.    Indeed, the Weehawken Officials favored similarly situated owners of property adjacent to and surrounding 63 Chestnut and 65 Chestnut in a deliberate, unjustifiable, arbitrary and discriminatory manner by allowing those owners to proceed with remediation and repairs of their buildings after Hurricane Sandy while harassing Plaintiffs and issuing two baseless stop work orders (*i.e.* the First Baseless Stop Work Order and the Second Baseless Stop Work Order), which arbitrarily and capriciously ordered that all work stop at 63 Chestnut and 65 Chestnut.

273.    In addition, the Weehawken Officials favored the similarly situated owners of properties adjacent to and surrounding 63 Chestnut and 65 Chestnut in a deliberate, unjustifiable, arbitrary and discriminatory manner by picking up the garbage and debris of those owners at the adjacent properties while arbitrarily refusing to pick up the garbage and debris of Plaintiffs at 63 Chestnut and 65 Chestnut.

274.    The Weehawken Officials had no reasonable, rational or legitimate basis for such

disparate treatment.  Rather, the Weehawken Officials' conduct was intentional, willful and malicious and was motivated by the Weehawken Officials' intent to discriminate against Plaintiffs and to punish and/or inhibit Plaintiffs' exercise of their constitutional rights.

275.    In addition, the Weehawken Officials knew, or should have known, that they were violating Plaintiffs' established constitutional rights to equal protection, and it was not objectively reasonable for the Weehawken Officials to believe that their conduct did not violate Plaintiffs' established constitutional rights to equal protection.

276.    As such, by the aforementioned conduct, the Weehawken Officials denied and continue to deny Plaintiffs their rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the Unites States.

277.    As a result of the Weehawken Officials' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.  In addition, the Weehawken Officials' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

## COUNT SEVEN
## DEPRIVATION OF EQUAL PROTECTION UNDER THE
## FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
## (42 U.S.C. § 1983)
## (Against Weehawken)

278.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

279.    Turner, Tattoli, Ahmad, and Venino, as the Mayor of Weehawken, the Construction Official of Weehawken, the Assistant Township Manager of Weehawken, and the Law Director of Weehawken, respectively, are individuals who have final policymaking authority with regard to the management and operation of Weehawken, including the Building

59

Department and Public Works Department, rendering their conduct acts of official government policy of Weehawken.

280.    Weehawken, through Turner, Tattoli, Ahmad, and Venino, has persistently ratified the deprivation of equal protection by the Weehawken Officials set forth above.

281.    In addition, despite having knowledge of the Weehawken Officials' repeated unlawful conduct, Weehawken, through Turner, Tattoli, Ahmad, and Venino, intentionally and knowingly failed to take affirmative action to stop such unlawful conduct.  Weehawken, through Turner, Tattoli, Ahmad, and Venino, also intentionally and knowingly failed to supervise, control and/or discipline the Weehawken Officials who engaged in the unlawful conduct in the performance of their official duties.

282.    In addition, Turner, Tattoli, Ahmad, and Venino have affirmatively participated in and directed the unconstitutional conduct set forth above.

283.    As such, by the aforementioned conduct, Weehawken denied and continues to deny Plaintiffs their rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the Unites States.

284.    As a direct and proximate result of Weehawken's unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.

**COUNT EIGHT**
**CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**
**(42 U.S.C. § 1985)**
**(Against the Weehawken Officials in their Individual Capacities)**

285.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

286.    The Weehawken Officials agreed to, and in fact conspired, to engage in a collective campaign of harassment and intimidation to deprive Plaintiffs of equal protection, as guaranteed by the Fourteenth Amendment of the United States Constitution, and to coerce Plaintiffs to agree to sign the U&O Agreement and to provide Ed Devaney with the Renovated 63 Chestnut Apartment at a rate of only $163 per month.

287.    The Weehawken Officials, in concert with each other, intentionally targeted Plaintiffs, treating them differently from other similarly situated owners of property neighboring Plaintiffs' properties by operating Weehawken's Building Department and Public Works Department in a deliberate, unjustifiable, arbitrary and discriminatory manner, in an attempt to unlawfully limit, interfere with and otherwise deprive Plaintiffs of their constitutionally protected liberty and property interests.

288.    Indeed, the Weehawken Officials favored similarly situated owners of property adjacent to and surrounding 63 Chestnut and 65 Chestnut in a deliberate, unjustifiable, arbitrary and discriminatory manner by allowing those owners to proceed with remediation and repairs of their buildings after Hurricane Sandy while harassing Plaintiffs and issuing two baseless stop work orders (*i.e* the First Baseless Stop Work Order and the Second Baseless Stop Work Order), which arbitrarily and capriciously ordered that all work stop at 63 Chestnut and 65 Chestnut.

289.    In addition, the Weehawken Officials favored similarly situated owners of property adjacent to and surrounding 63 Chestnut and 65 Chestnut in a deliberate, unjustifiable, arbitrary and discriminatory manner by picking up the garbage and debris of those owners while refusing to pick up the garbage and debris of Plaintiffs at 63 Chestnut and 65 Chestnut.

290.    The Weehawken Officials had no reasonable, rational or legitimate basis for such disparate treatment, which was motivated by the Weehawken Officials' intent to discriminate

against Plaintiffs and to punish and/or inhibit Plaintiffs' exercise of their constitutional rights.

291.    As such, by the aforementioned conduct, the Weehawken Officials, in concert with each other, denied Plaintiffs their rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the Unites States.

292.    As a result of the Weehawken Officials' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.  In addition, the Weehawken Officials' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT NINE**
**VIOLATION OF CIVIL RIGHTS UNDER NEW JERSEY CIVIL RIGHTS ACT**
**(N.J.S.A. § 10:6-2(c))**
**(Against Weehawken and the Weehawken Officials in their Individual Capacities)**

293.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

294.    By the aforementioned conduct, Weehawken and the Weehawken Officials violated and continue to violate Plaintiffs' due process and equal protection rights guaranteed by the Fourteenth Amendment of the United States Constitution and by Article I, Paragraph 1 of the New Jersey Constitution.

295.    As a result of Weehawken's and the Weehawken Officials' unlawful conduct, Plaintiffs have suffered and continue to suffer serious economic, property, mental and emotional, and other damages.  In addition, the Weehawken Officials' actions as alleged above were committed intentionally and with malice, or with such recklessness as to be tantamount to intentional conduct, entitling Plaintiffs to punitive damages.

**COUNT TEN**
**VIOLATION OF FEDERAL RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT**
**(18 U.S.C. § 1962(c))**
**(Against the Weehawken Officials in their Individual Capacities)**

296.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

297.    Turner, Tattoli, Ahmad, Venino, and Masterson are "persons" within the meaning of 18 U.S.C. § 1961(3).

298.    Weehawken is an "enterprise" which engaged in, and continues to engage in, and which activities affected, and continue to affect, interstate or foreign commerce, within the meaning of 18 U.S.C. § 1961(4).

299.    In the alternative, Turner, Tattoli, Ahmad, Venino, and Masterson, acting together and in concert with each other, were and are an association-in-fact, which function together as a continuing unit with an ascertainable structure separate and distinct from the "pattern of racketeering activity" alleged herein, and which therefore constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

300.    The association-in-fact enterprise consisting of Turner, Tattoli, Ahmad, Venino, and Masterson engaged in, and continues to engage in, and its activities affected, and continue to affect, interstate or foreign commerce.

301.    Beginning in November 2012, and continuing through the present, Turner, Tattoli, Ahmad, Venino, and Masterson were employed by and/or associated with the enterprise, to conduct or participate, directly or indirectly, in the conduct of the enterprise through a pattern of racketeering activity.

302.    Turner, Tattoli, Ahmad, Venino, and Masterson formed a scheme or artifice to

harass, intimidate, retaliate against, and extort Plaintiffs to, among other things, (i) provide Ed

Devaney with housing in the Renovated 63 Chestnut Apartment at a rate of only $163 per month,

even though the fair market rental value for the apartment is approximately $1,100 per month,

(ii) refrain from asserting a claim against Ed Devaney for twenty-one (21) months of past rent

due to Plaintiffs for the 65 Chestnut Apartment, (iii) refrain from asserting a claim against Chris

Devaney for twelve (12) months past rent due to Plaintiffs for the 63 Chestnut apartment Chris

Devaney previously occupied, and (iv) refrain from evicting Ed Devaney even though he

breached, and continues to breach, the U&O Agreement.

303.    Turner, Tattoli, Ahmad, Venino, and Masterson carried out the scheme or artifice

to harass, intimidate, retaliate against, and extort Plaintiffs by, *inter alia*:

(a)    making dozens of harassing telephone calls to Singh over the course of eleven months, beginning in November 2012;

(b)    threating to perform the repairs at 63 Chestnut and 65 Chestnut and place a lien on the properties;

(c)    refusing to collect garbage and debris at 63 Chestnut and 65 Chestnut;

(d)    going to 65 Chestnut and harassing and being belligerent with Plaintiffs' tenants, beginning in January 2013;

(e)    loitering at and attempting to break into 63 Chestnut;

(f)    issuing the First Baseless Stop Work Order in January 2013;

(g)    issuing the stop work order in connection with the minor work at Singh's personal residence in February 2013;

(h)    issuing the Second Baseless Stop Work Order in May 2013;

(i)    refusing to lift the Second Baseless Stop Work Order until Plaintiffs consented to the $163 monthly rent and agreed to execute the U&O Agreement;

(j)    informing Plaintiffs that they should enter into the U&O Agreement before the hearing on Plaintiffs' Appeal;

(k)     berating Plaintiffs' attorney for failing to attend a purportedly scheduled meeting to discuss the U&O Agreement;

(l)     obligating Plaintiffs to execute the U&O Agreement in the Weehawken Town Hall in the presence of the Weehawken Law Director and Assistant Town Manager and immediately outside of the Mayor's office in October 2013; and

(m)     issuing a Notice of Violations listing numerous baseless violations in July 2014.

304.     The foregoing acts by Turner, Tattoli, Ahmad, Venino, and Masterson were committed willfully.

305.     By the forgoing acts, Turner, Tattoli, Ahmad, Venino, and Masterson attempted to and, in fact, did obtain property from Plaintiffs, including, but not limited to, the right to pursue a lawful business, the right to make business decisions free from outside pressure (*i.e.* free from harassment, intimidation and retaliation from individuals under color of official right), and substantial profits from lost rents.

306.     The foregoing acts by Turner, Tattoli, Ahmad, Venino, and Masterson involve extortion as defined under N.J.S.A. § 2C:20-5(d) and under 18 U.S.C. § 1951(b)(2) and, which are crimes chargeable and punishable by imprisonment for more than one year.

307.     The foregoing acts involving extortion by Turner, Tattoli, Ahmad, Venino, and Masterson constitute illegal acts defined as predicate acts of racketeering activity under and 18 U.S.C. § 1961(1)(A) and 18 U.S.C. § 1961(1)(B).

308.     The foregoing predicate acts involving extortion were undertaken by Turner, Tattoli, Ahmad, Venino, and Masterson repeatedly and continuously over the course of approximately two and a half years, from October 2012 to the present.

309.     The foregoing predicate acts involving extortion are related as they were undertaken by Turner, Tattoli, Ahmad, Venino, and Masterson with the common purpose of forcing Plaintiffs to, among other things, (i) provide Ed Devaney with housing in the Renovated

63 Chestnut Apartment at a rate of only $163 per month, even though the fair market rental value

for the apartment is approximately $1,100 per month, (ii) refrain from asserting a claim against

Ed Devaney for twenty-one (21) months of past rent due to Plaintiffs for the 65 Chestnut

Apartment, (iii) refrain from asserting a claim against Chris Devaney for twelve (12) months past

rent due to Plaintiffs for the 63 Chestnut apartment Chris Devaney previously occupied, and (iv)

refrain from evicting Ed Devaney even though he breached, and continues to breach, the U&O

Agreement.

310.    The foregoing related and continuous predicate acts involving extortion constitute

a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

311.    As set forth above, for approximately two and a half years, Turner, Tattoli,

Ahmad, Venino, and Masterson acted in concert to knowingly, intentionally and willfully

conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise

consisting of Turner, Tattoli, Ahmad, Venino, and Masterson and played a direct, knowing and

willful role in the management and operation of that enterprise in connection with or through the

pattern of racketeering activity set forth above in violation of 18 U.S.C. § 1962(c).

312.    As a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(c),

Plaintiffs have been damaged within the meaning of 18 U.S.C. § 1964(c).

## COUNT ELEVEN
## CONSPIRACY TO VIOLATE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## (18 U.S.C. § 1962(d))
## (Against the Weehawken Officials in their Individual Capacities)

313.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs

as if set forth at length herein.

314.    Turner, Tattoli, Ahmad, Venino, and Masterson knowingly agreed with one

another to enter into and facilitate a conspiracy to violate the provisions of 18 U.S.C. § 1962(c) as set forth above.

315.    At all relevant times, Turner, Tattoli, Ahmad, Venino, and Masterson knowingly and intentionally agreed and conspired with each other to commit or to assist in the commission of at least two of the predicate acts set forth above, and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering activity in that, among other things, such predicate acts were designed to extort Plaintiffs to, among other things, (i) provide Ed Devaney with housing in the Renovated 63 Chestnut Apartment at a rate of only $163 per month, even though the fair market rental value for the apartment is approximately $1,100 per month, (ii) refrain from asserting a claim against Ed Devaney for twenty-one (21) months of past rent due to Plaintiffs for the 65 Chestnut Apartment, (iii) refrain from asserting a claim against Chris Devaney for twelve (12) months past rent due to Plaintiffs for the 63 Chestnut apartment Chris Devaney previously occupied, and (iv) refrain from evicting Ed Devaney even though he breached, and continues to breach, the U&O Agreement.

316.    In furtherance of their conspiracy to violate 18 U.S.C. § 1962(c), Turner, Tattoli, Ahmad, Venino, and Masterson engaged in the above-described pattern of racketeering activity and, by their direct, knowing and willful management and operation of the enterprise, in connection with or through the pattern of racketeering activity, each of them conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise.

317.    As a direct and proximate result of the foregoing conspiracy in violation of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c), Plaintiffs have been damaged within the meaning of 18 U.S.C. § 1964(c).

**COUNT TWELVE**
**VIOLATION OF NEW JERSEY RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT**
**(N.J.S.A. § 2C:41-2(c))**
**(Against the Weehawken Officials in their Individual Capacities)**

318.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

319.    Turner, Tattoli, Ahmad, Venino, and Masterson are "persons" within the meaning of N.J.S.A. § 2C:41-1(b).

320.    Weehawken is an "enterprise" which engaged in, and continues to engage in, and which activities affected, and continue to affect, interstate or foreign commerce, within the meaning of N.J.S.A. § 2C:41-1(c),

321.    In the alternative, Turner, Tattoli, Ahmad, Venino, and Masterson, acting together and in concert with each other, were and are an association-in-fact, which function together as a continuing unit with an ascertainable structure separate and distinct from the "pattern of racketeering activity" alleged herein, and which therefore constitutes an "enterprise" within the meaning of N.J.S.A. § 2C:41-1(c).

322.    The association-in-fact enterprise consisting of Turner, Tattoli, Ahmad, Venino, and Masterson engaged in, and continues to engage in, and its activities affected, and continue to affect, interstate or foreign commerce.

323.    Beginning in November 2012, and continuing through the present, Turner, Tattoli, Ahmad, Venino, and Masterson were employed by and/or associated with the enterprise, to conduct or participate, directly or indirectly, in the conduct of the enterprise through a pattern of racketeering activity.

324.    Turner, Tattoli, Ahmad, Venino, and Masterson formed a scheme or artifice to

harass, intimidate, retaliate against, and extort Plaintiffs to, among other things, (i) provide Ed Devaney with housing in the Renovated 63 Chestnut Apartment at a rate of only $163 per month, even though the fair market rental value for the apartment is approximately $1,100 per month, (ii) refrain from asserting a claim against Ed Devaney for twenty-one (21) months of past rent due to Plaintiffs for the 65 Chestnut Apartment, (iii) refrain from asserting a claim against Chris Devaney for twelve (12) months past rent due to Plaintiffs for the 63 Chestnut apartment Chris Devaney previously occupied, and (iv) refrain from evicting Ed Devaney even though he breached, and continues to breach, the U&O Agreement.

325.     Turner, Tattoli, Ahmad, Venino, and Masterson carried out the scheme or artifice to harass, intimidate, retaliate against, and extort Plaintiffs by, *inter alia*:

(a)     making dozens of harassing telephone calls to Singh over the course of eleven months, beginning in November 2012;

(b)     threating to perform the repairs at 63 Chestnut and 65 Chestnut and place a lien on the properties;

(c)     going to 65 Chestnut and harassing and being belligerent with Plaintiffs' tenants, beginning in January 2013;

(d)     loitering at and attempting to break into 63 Chestnut;

(e)     refusing to collect garbage and debris at 63 Chestnut and 65 Chestnut;

(f)     issuing the First Baseless Stop Work Order in January 2013;

(g)     issuing the stop work order in connection with the minor work at Singh's personal residence in February 2013;

(h)     issuing the Second Baseless Stop Work Order in May 2013;

(i)     refusing to lift the Second Baseless Stop Work Order until Plaintiffs consented to the $163 monthly rent and agreed to execute the U&O Agreement;

(j)     informing Plaintiffs that they should enter into the U&O Agreement before the hearing on Plaintiffs' Appeal;

(k)     berating Plaintiffs' attorney for failing to attend a purportedly scheduled meeting to discuss the U&O Agreement;

(l)     obligating Plaintiffs to execute the U&O Agreement in the Weehawken Town Hall in the presence of the Weehawken Law Director and Town Manager and immediately outside of the Mayor's office in October 2013; and

(m)     issuing a Notice of Violations listing numerous baseless violations in July 2014.

326.     The foregoing acts by Turner, Tattoli, Ahmad, Venino, and Masterson were committed willfully.

327.     By the forgoing acts, Turner, Tattoli, Ahmad, Venino, and Masterson attempted to and, in fact, did obtain property from Plaintiffs, including, but not limited to, the right to pursue a lawful business, the right to make business decisions free from outside pressure (*i.e.* free from harassment, intimidation and retaliation from individuals under color of official right), and substantial profits from lost rents.

328.     The foregoing acts by Turner, Tattoli, Ahmad, Venino, and Masterson involve extortion as defined under N.J.S.A. § 2C:20-5(d) and under 18 U.S.C. § 1951(b)(2) and, which are crimes chargeable and punishable by imprisonment for more than one year.

329.     The foregoing acts involving extortion by Turner, Tattoli, Ahmad, Venino, and Masterson constitute illegal acts defined as predicate acts of racketeering activity under N.J.S.A. § 2C:41-1(a)(h) and N.J.S.A. § 2C:41-1(a)(n).

330.     The foregoing predicate acts involving extortion were undertaken by Turner, Tattoli, Ahmad, Venino, and Masterson repeatedly and continuously over the course of approximately two and a half years, from October 2012 to the present.

331.     The foregoing predicate acts involving extortion are related as they were undertaken by Turner, Tattoli, Ahmad, Venino, and Masterson for the common purpose of forcing Plaintiffs to, among other things, (i) provide Ed Devaney with housing in the Renovated

70

63 Chestnut Apartment at a rate of only $163 per month, even though the fair market rental value for the apartment is approximately $1,100 per month, (ii) refrain from asserting a claim against Ed Devaney for twenty-one (21) months of past rent due to Plaintiffs for the 65 Chestnut Apartment, (iii) refrain from asserting a claim against Chris Devaney for twelve (12) months past rent due to Plaintiffs for the 63 Chestnut apartment Chris Devaney previously occupied, and (iv) refrain from evicting Ed Devaney even though he breached, and continues to breach, the U&O Agreement.

332.    The foregoing related and continuous predicate acts involving extortion constitute a pattern of racketeering activity as defined by N.J.S.A. § 2C:41-1(d).

333.    As set forth above, for approximately two and a half years, Turner, Tattoli, Ahmad, Venino, and Masterson acted in concert to knowingly, intentionally and willfully conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise and played a direct, knowing and willful role in the management and operation of that enterprise in connection with or through the pattern of racketeering activity set forth above in violation of N.J.S.A. § 2C:41-2(c).

334.    As a direct and proximate result of the foregoing violation of N.J.S.A. § 2C:41-2(c), Plaintiffs have been damaged within the meaning of N.J.S.A. § 2C:41-4(c).

## COUNT THIRTEEN
### CONSPIRACY TO VIOLATE NEW JERSEY RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (N.J.S.A. § 2C:41-2(d))
### (Against the Weehawken Officials in their Individual Capacities)

335.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth at length herein.

336.    Turner, Tattoli, Ahmad, Venino, and Masterson knowingly agreed with one

another to enter into and facilitate a conspiracy to violate the provisions of N.J.S.A. § 2C:41-2(c) as set forth above.

337.   At all relevant times, Turner, Tattoli, Ahmad, Venino, and Masterson knowingly and intentionally agreed and conspired with each other to commit or to assist in the commission of at least two of the predicate acts set forth above, and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering activity in that, among other things, such predicate acts were designed to extort Plaintiffs to, among other things, (i) provide Ed Devaney with housing in the Renovated 63 Chestnut Apartment at a rate of only $163 per month, even though the fair market rental value for the apartment is approximately $1,100 per month, (ii) refrain from asserting a claim against Ed Devaney for twenty-one (21) months of past rent due to Plaintiffs for the 65 Chestnut Apartment, (iii) refrain from asserting a claim against Chris Devaney for twelve (12) months past rent due to Plaintiffs for the 63 Chestnut apartment Chris Devaney previously occupied, and (iv) refrain from evicting Ed Devaney even though he breached, and continues to breach, the U&O Agreement.

338.   In furtherance of their conspiracy to violate N.J.S.A. § 2C:41-2(c), Turner, Tattoli, Ahmad, Venino, and Masterson engaged in the above-described pattern of racketeering activity and, by their direct, knowing and willful management and operation of their enterprise, in connection with or through the pattern of racketeering activity, each of them conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise.

339.   As a direct and proximate result of the foregoing conspiracy in violation of N.J.S.A. § 2C:41-2(d), to violate N.J.S.A. § 2C:41-2(c), Plaintiffs have been damaged within the meaning of N.J.S.A. § 2C:41-4(c).

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter judgment against

Weehawken and the Weehawken Officials, in their individual capacities:

a.      declaring that Weehawken and the Weehawken Officials violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article I, Paragraph 1 of the New Jersey Constitution;

b.      declaring that Weehawken and the Weehawken Officials violated the Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution and Article I, Paragraph 1 of the New Jersey Constitution;

c.      awarding injunctive relief prohibiting and enjoining Weehawken and the Weehawken Officials from interfering with or unlawfully targeting Plaintiffs' business or use of property;

d.      awarding compensatory damages;

e.      awarding exemplary and punitive damages;

f.      awarding treble damages, pursuant to 18 U.S.C. § 1964(c), and N.J.S.A. § 2C:41-4(c); and

g.      awarding attorneys' fees, pursuant to 42 U.S.C. § 1988, 18 U.S.C. § 1964(c), N.J.S.A. § 10:6-2(f) and N.J.S.A. § 2C:41-4(c);

h.      awarding such other and further relief as the Court may deem just and proper either in law or in equity.


## DEMAND FOR TRIAL BY JURY

Plaintiffs request a trial by jury on all issues so triable.

Dated: May 20, 2015                     **KRANJAC TRIPODI & PARTNERS LLP**


By: s/ Xavier M. Bailliard
       Xavier M. Bailliard
       Joseph Tripodi
       30 Wall Street, 12th Floor
       New York, NY 10005
       Tel: (646) 216-2400
       Fax: (646) 216-2373
       xbailliard@ktpllp.com
       jtripodi@ktpllp.com

       *Attorneys for Plaintiffs Santosh Singh,*
       *Virendra Singh, and 63-65 Chestnut, LLC*

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

I hereby certify that, to the best of my knowledge, information and belief, the matter in

controversy is otherwise not the subject of any action pending in any Court or of a pending

arbitration proceeding and that no other action or arbitration proceeding is contemplated.

Dated: May 20, 2015                                   s/ Xavier M. Bailliard
                                                          Xavier M. Bailliard