NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SANTOSH SINGH, VIRENDRA SINGH, 63-65 CHESTNUT, LLC, and SANDALWOOD HOLDINGS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> TOWNSHIP OF WEEHAWKEN, MAYOR RICHARD F. TURNER, in his Official and Individual Capacities, FRANK TATTOLI, in his Official and Individual Capacities, GIOVANNI D. AHMAD, in his Official and Individual Capacities, RICHARD P. VENINO, in his Official and Individual Capacities, and SHAUN D. MASTERSON, in his Official and Individual Capacities, <br><br> Defendants. | Civil Action No. 15-3478 (SRC) <br><br> **OPINION** |

**CHESLER**, District Judge

This matter comes before the Court on Defendants' motion to enforce the parties' purported settlement agreement. (ECF No. 214). The Court has reviewed the papers and heard oral argument on April 3, 2024. For the following reasons, Defendants' motion will be **GRANTED**.

**I.   BACKGROUND**

The facts of this action stretch back over a decade. The crux of Plaintiffs' allegations in their initial complaint was that Defendants Frank Tattoli ("Tattoli"), Richard F. Turner, Giovanni D. Admad, Richard P. Venino, and Shaun D. Masterson—all officials of the Township of Weehawken—engaged in an illegal scheme of harassment and intimidation to force Plaintiffs,

1

landlords owning property in Weehawken, to provide low-cost housing to Edward Devaney ("Devaney"). Plaintiffs allege, inter alia, that Defendants harassed them through arbitrary regulatory holdups based on the damage to their properties caused by Hurricane Sandy and subsequent repairs. Plaintiffs brought claims pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 18 U.S.C. § 1962, as well as state law equivalents.

In August 2019, the Court partially granted Defendants' summary judgment motion by dismissing three of Plaintiffs' thirteen causes of action. (ECF No. 125). Operating under the constraints imposed by COVID-19, the Court held the final pretrial conference almost one year later in July 2020. The Court entered the Final Pretrial Order the following month in August 2020. (ECF No. 146). The parties then filed various motions in limine, which the Court decided in March 2021. (ECF Nos. 164-165). At this point, the action was effectively ready for trial, but the Court delayed trial, in part due to the challenges posed by COVID-19. In February 2022, Plaintiffs moved to amend the Complaint to include additional allegations. (ECF No. 169). Plaintiffs alleged that after Hurricane Ida struck New Jersey, Defendants forced those residing at three of Plaintiffs' properties, including Plaintiff Santosh Singh, to immediately vacate the properties because of a mudslide on the cliffs below. Defendants then allegedly ordered these properties to be demolished because they were structurally unsound. Plaintiffs further allege they hired an engineer to rebut Defendants' assertions, causing Defendants to ultimately reverse the orders to vacate and demolish the properties. (ECF No. 166). After consideration of Plaintiffs' motion, U.S.M.J. Cathy L. Waldor denied leave to amend the Complaint, finding the proposed amendments would significantly prejudice Defendants and unduly burden the Court. This Court affirmed Judge Waldor's decision on April 27, 2023.

Thereafter, from approximately June 6 to June 28, 2023, the parties engaged in mediation with U.S.M.J. Joseph A. Dickson (ret.). On June 27, 2023, Judge Dickson proposed a final settlement requiring Defendants to pay Plaintiffs $625,000 for dismissal of this matter[1] with prejudice. See Declaration of Joan M. Gilbride ("Gilbride Decl.") at ¶¶ 5-6; Declaration of Xavier M. Bailliard ("Bailliard Decl.") at ¶¶ 8-9. On June 28, 2023, Defendants informed Judge Dickson they accepted the proposal. Gilbride Decl. at ¶ 6. Plaintiffs conditioned their acceptance, however, on four conditions:

> 1. Weehawken agrees to finally issue the [certificates of occupancy] for the two units in 63 Chestnut (one of which has been knowingly occupied by Ed Devaney since 2013), which it has failed to issue to date.
>
> 2. Weehawken agrees to lift the two stop work orders from 2013, which are still listed as unabated in its records.
>
> 3. Ed Devaney to be removed as a tenant from the buildings (either by or facilitated by the Township).
>
> 4. Weehawken agrees to have any (i) rent leveling regulation/issues, (ii) site plan/development approvals, and (iii) inspections for [Plaintiffs'] properties in Weehawken to be handled by Jersey City (or the DCA).

See Bailliard Decl., Ex. E. Defendants relayed their acceptance of conditions (1)-(3) to Judge Dickson with the caveat that, as to condition (1), Plaintiffs must "proceed with the normal process," meaning they "should submit an application; the application would be reviewed and an inspection would be conducted by the New Jersey Department of Community Affairs ('DCA') since

---

[1] Defendants initially sought a complete release of all claims raised in this suit and any claims arising out of the events that transpired between the parties in the aftermath of Hurricane Ida. However, Defendants "ultimately agreed to accept a less than general release." Gilbride Decl. at ¶ 4.

3

[P]laintiffs requested that Weehawken's Building Department not be involved."[2] Gilbride Decl. at ¶ 8. As to condition (4), Defendants agreed to parts (i) and (iii), so long as Plaintiffs initially file all rent levelling issues in Weehawken, "so that Weehawken ha[s] records pertaining to those issues." Id. Defendants flatly rejected part (ii), explaining they "did not agree to allow any entity other than Weehawken to be involved with zoning, site plan and development approvals (all referred to as zoning)." Id. Plaintiffs accepted[3] Defendants' response to the list of settlement conditions, including Defendants' rejection of condition (4), part (ii). See id.; Bailliard Decl. at ¶¶ 12-13. The parties agreed Plaintiffs would draft a written settlement agreement memorializing these terms, and Judge Dickson informed the Court this matter was settled. Gilbride Decl. at ¶ 9; Bailliard Decl. at ¶¶ 14-16. On June 29, 2023, the Court entered a 60-day Order administratively terminating this action. (ECF No. 200).

### a. Defendants' Alleged Inspections of the Chestnut Street Properties

Plaintiffs assert that, on July 6, 2023, they received a Notice of Violation ("NOV") alerting them that the Weehawken Building Department had found two International Property Maintenance Code ("IPMC") violations[4] at Plaintiffs' properties located at 63-65 Chestnut Street in Weehawken (the "Chestnut Street Properties"). Bailliard Decl., Ex. I. The NOV—signed by Tattoli,

---

[2] Plaintiffs dispute Judge Dickson informed them that Defendants would require an application and inspection prior to issuing the certificates of occupancy. Pl. Opp. Br. at 14.

[3] Plaintiffs contend they understood "site plan/development approvals" as including "more than just zoning issues, and [they] were never informed that Defendants viewed otherwise." Bailliard Decl. at ¶ 12. Plaintiffs assert they "included this condition to ensure that any site plan approvals, permitting, issuance of certificates of occupancy, etc. (unrelated to zoning) be referred to another municipality, so that Plaintiffs would finally be able to develop the Rezoned Property without any undue obstruction by Defendants." Id. Plaintiffs' "Rezoned Property" is located at 60 West 19th Street, Weehawken, NJ 07086. See id. at ¶ 10.

[4] The NOV lists violations for IPMC 304.1 ("The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety or welfare") and 304.1.1-12 ("Chimneys, cooling towers, smokestacks and similar appurtenances not structurally sound or not properly anchored, or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects"). Bailliard Decl., Ex. I.

Weehawken's Code Compliance Officer—lists an inspection date of June 21, 2023 and a compliance deadline of July 10, 2023.[5] Id. Plaintiffs argue that, if they had known of the "surreptitious inspection and resulting violations," they would not have accepted Defendants' rejection of the condition that "site plan/development approvals" be handled by Jersey City or the DCA. Id. at ¶ 18. Plaintiffs contend these events mirror many of the allegations leveled at Defendants in the Complaint, constituting the latest in a cycle of unnoticed inspections that are "then used to harass Plaintiffs by issuing stop work orders." See Pl. Opp. Br. at 7.

On July 7, 2023, Plaintiffs received a letter from the Weehawken Building Department—again signed by Tattoli—informing them that, "[u]pon further inspection … there does not appear to be an imminent hazard" at the Chestnut Street Properties. Bailliard Decl., Ex. K. The correspondence noted an upcoming DCA inspection of the Chestnut Street Properties on July 13, 2023 and extended Plaintiffs' compliance deadline for the IPMC violations from July 10, 2023 to September 8, 2023. Id. Plaintiffs read this correspondence as evidence that Tattoli performed a second inspection of the Chestnut Street Properties in violation of the condition that Jersey City or DCA officials conduct all inspections of Plaintiffs' properties. See Pl. Opp. Br. at 8.

As further evidence of bad faith, Plaintiffs allege Defendants refused their request for assistance "in working with the State to push off the DCA inspection until the settlement was finalized." See Bailliard Decl. at ¶ 21. Plaintiffs advance that, during a meeting with Judge Dickson intended to address post-settlement conflicts, Plaintiffs "were made to believe that" a DCA

---

[5] Plaintiffs assert Tattoli later represented he "did not know that the building he had inspected on June 21, 2023 was owned by" Plaintiffs. Bailliard Decl. at ¶ 32. Plaintiffs construe this statement as further evidence that "the inspections were performed in bad faith and that the first inspection was concealed from Plaintiffs, including during the settlement negotiations and on June 28, 2023." Id. at ¶ 34. Defendants submit that Tattoli visited the Chestnut Street Properties in response to a neighbor's complaint "regarding a tilted chimney," at which time he photographed the chimney but did not conduct a "full property inspection." Gilbride Reply Decl. at ¶ 10, Ex. C. At oral argument, Plaintiffs' counsel conceded there is no evidence the remaining Defendants were aware during mediation that Tattoli had visited and photographed the Chestnut Street Properties.

5

inspection of the Chestnut Street Properties—specifically, the unit Devaney formerly occupied—scheduled for July 20, 2023 "would be rescheduled" with no fine assessed. Id. at ¶¶ 35-38. Nevertheless, Plaintiffs received two violation notices and fines for the missed inspection on July 20, 2023. Id., Ex. L. The first violation notice states Plaintiffs refused entry to Tattoli; the second notice complains of refused entry to inspector Arturo Miqueli. See id. Plaintiffs took the violation notices as evidence that Tattoli had performed yet another inspection of the Chestnut Street Properties, despite the settlement condition forbidding inspections by Weehawken officials. Id. at ¶ 39. Defendants denied that Tattoli was present at the Chestnut Street Properties on July 20, 2023 or that Tattoli had "anything whatsoever to do with the [] violations." Id., Ex. M. The parties then met with Judge Waldor, after which Defendants "agreed to assist Plaintiffs in resolving the DCA notice of violation and obtain an explanation as to why Tattoli was identified as an inspector." Id. at ¶¶ 43-44. Plaintiffs eventually were satisfied that Tattoli was in fact not present at the Chestnut Street Properties on July 20, 2023; nevertheless, this hiccup "further enhanced Plaintiffs' belief that Defendants had no intention to comply with the settlement conditions." See id. at ¶ 44.

### b. The Unit at 63 Chestnut Street Formerly Occupied by Edward Devaney

Separate from the issue of property inspections, Plaintiffs argue Defendants implicitly represented during mediation that the unit at 63 Chestnut Street that Devaney formerly occupied was vacant. See id. at ¶ 25; Pl. Opp. Br. at 9. During mediation, Defendants relayed that Devaney was deceased and, thus, no longer occupying the apartment. Bailliard Decl. at ¶ 24. Plaintiffs understood this to mean the unit was unoccupied and were surprised when, on July 13, 2023, they discovered Devaney's nephew residing in the apartment. See id. at ¶¶ 25-26. Plaintiffs sought Defendants' assistance in removing Devaney's nephew from the unit; Defendants initially refused but later sent a police officer to assist Plaintiffs in changing the locks. Id. at ¶¶ 28, 31.

Plaintiffs contend that, had they known Devaney's nephew was living in the apartment, they would have altered their settlement conditions to require Defendants' assistance in evicting "any unlawful occupant of [] Devaney's apartment." Id. at ¶ 29. Plaintiffs further submit that if they had known of the poor interior condition of the apartment, "they would not have agreed to a payment of only $625,000." Pl. Opp. Br. at 13.

### c. Plaintiffs' Draft of the Settlement Agreement

On October 27, 2023, Plaintiffs transmitted a draft written settlement agreement to Defendants. See Gilbride Decl., Ex. D. Defendants rejected the draft as "wholly unacceptable" due to its addition of certain settlement provisions and returned redlined and "clean" versions of the agreement to Plaintiffs. Id. at ¶ 11.

In particular, Defendants took issue with the following monetary provisions: (1) Defendants to pay Plaintiffs $5,390 for "legal fees and costs incurred by Plaintiffs as a result of acts by Defendants during the course of settlement negotiations relating to certain inspections of [the Chestnut Street Properties] on or about June 21, 2023 and July 20, 2023"; (2) Defendants to pay Plaintiffs $73,150 for repairs to the apartment Devaney formerly occupied; (3) Defendants to pay Plaintiffs $200,000—"an estimate of damages Plaintiffs would incur as a result of the diminution of the value of" their properties—as liquidated damages in the event of a breach of Paragraphs 2(d)-(h) of the settlement agreement; (4) Defendants to pay Plaintiffs' attorney's fees and costs incurred in the event of litigation to enforce Plaintiffs' rights under the agreement; and (5) in the event of a breach of Paragraphs 2(d)-(h), Defendants "shall be liable for any and all engineering, architectural, expert, attorney, and/or any other costs/fees incurred by Plaintiffs." Id., Ex. D at ¶¶ 2(b)-(c), 3, 12; Bailliard Decl., Ex. N.

7

As to non-monetary provisions in the draft settlement agreement, Defendants rejected several: (1) Defendants to issue certificates of occupancy "for all units in 63 Chestnut Street" upon executing the agreement; (2) Defendants to "provide Plaintiffs with copies of file-stamped rent leveling registration statements for 35 Chestnut, 36 Chestnut, and 4 Lincoln Place for the years 2021, 2022, and 2023"; (3) Defendants to refrain from any involvement in landlord-tenant disputes, rent levelling and rent control disputes, building inspections, and filings relating to "zoning, variance, site-plan, development, new construction, addition, remediation, structural alteration, interior modification, parking layout changes, land use, fencing, retaining wall, shoring plan, environmental compliance, and/or any other project" involving or relating to Plaintiffs' properties; and (4) Defendants to "[r]eissue, revive, renew, and/or reapprove of … the Resolution of the Zoning Board of Adjustment, Township of Weehawken, relating to Application #242 … regarding the proposed development set fort therein."[6] See Gilbride Decl., Ex. D at ¶ 2(d), (f)-(h).

## II. DISCUSSION

"Courts treat a motion to enforce settlement under the same standard as a motion for summary judgment because the central issue is whether there is any disputed issue of material fact as to the validity of the settlement agreement." Martin v. Hoveround Corp., 2011 WL 742573, at *2 (D.N.J. Feb. 24, 2011) (citing Washington v. Klem, 388 F. App'x 84, 85 (3d Cir. 2010)). Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth

---

[6] Plaintiffs assert they included this provision to ensure the uninhibited development of the Rezoned Property, which was "critical to Plaintiffs in entering into the settlement." Pl. Opp. Br. at 15. Defendants deem this provision an "egregious overreach" given the parties' alleged agreement that "zoning issues" were outside the bounds of any settlement. Gilbride Reply Decl. at ¶ 9.

in Rule 56(a)). The moving party carries the burden of proof, and the Court must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (quoting Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999)).

Typically, when disputes arise concerning the validity of settlement agreements, courts must look to general principles of local contract law to resolve the issues. See Mortellite v. Novartis Crop Prot., Inc., 460 F.3d 483, 492 (3d Cir. 2006) (citing Borough of Haledon v. Borough of N. Haledon, 358 N.J. Super. 289, 305 (App. Div. 2003)); Green v. John H. Lewis. & Co., 436 F.2d 389, 390 (3d Cir. 1970). Here, the Court must apply the law of the state of New Jersey, the forum state and state wherein the parties reached their purported settlement. As a preliminary note, New Jersey has a strong public policy in favor of settlements. See Nolan v. Lee Ho, 120 N.J. 465, 472 (1990); see also Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util., 206 N.J. Super. 523, 528 (App. Div. 1985) (noting courts will "strain to give effect to the terms of a settlement wherever possible"). Accordingly, any party seeking to avoid a settlement agreement must show by clear and convincing evidence that the agreement is unenforceable. Nolan, 120 N.J. at 471.

### a. Is the Settlement Agreement Valid and Enforceable?

Under New Jersey state law, contract formation requires "a meeting of the minds." Kernahan v. Home Warranty Admin. of Fla., Inc., 236 N.J. 301, 319 (N.J. 2019). For a meeting of the minds, "each party to the contract must have been fairly informed of the contract's terms before entering into the agreement." Hoffman v. Supplements Togo Mgmt., LLC, 419 N.J. Super. 596, 606 (App. Div. 2011). "Objective manifestations of intent are controlling when determining if there is a meeting of the minds." Vandergrift v. Pennsauken Sch. Dist., 2017 WL 6566139, at *3 (D.N.J. Dec. 22, 2017) (citing Brawer v. Brawer, 329 N.J. Super. 273, 283 (App. Div. 2000)) ("A

9

contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested.").

"[S]o long as the parties agree upon the essential terms of a settlement, leaving the details to be 'fleshed out' in a writing thereafter, courts will enforce settlement agreements notwithstanding the absence of a future writing." Trian Grp., Ltd. P'ship v. Accident & Cas. Ins. Co. of Winterthur, 2006 WL 1784310, at *3 (D.N.J. June 26, 2006). "A contract is no less a contract because some preferable clauses may be omitted either deliberately or by neglect." Berg Agency v. Sleepworld-Willingboro, Inc., 136 N.J. Super. 369, 377 (App. Div. 1975). "So long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound." Id. Conversely, "[w]here there is a misunderstanding between the parties pertaining to one of the material terms of an agreement, there is no meeting of the minds, and therefore no contract." Pac. All. Grp. Ltd. v. Pure Energy Corp., 2006 WL 166470, at *3 (D.N.J. Jan. 23, 2006).

With Judge Dickson acting as intermediary, the parties communicated to one another their mutual assent to the material terms of the settlement agreement. Judge Dickson proposed the parties settle this matter for payment of $625,000 from Defendants to Plaintiffs in exchange for complete dismissal of this action, with prejudice. Defendants relayed their acceptance[7] to Judge

---

[7] Although municipal defendants "can ordinarily act only by adoption of an ordinance or resolution at a public meeting," and therefore "must act by formal action … as to giving consent to the settlement of litigation," City of Jersey City v. Roosevelt Stadium Marina, Inc., 210 N.J. Super. 315, 327 (App. Div. 1986), Defendants have certified—and Plaintiffs have not contested—that Weehawken's governing body approved the settlement terms negotiated during mediation, see Gilbride Decl. at ¶ 11. Therefore, counsel was authorized to accept the settlement terms on behalf of Weehawken. The parties are presumed to have known that official, final approval of the settlement would have to wait until the terms were set forth in writing and Weehawken's governing body voted to approve. See Roosevelt Stadium Marina, Inc., 210 N.J. Super. at 331. Under these circumstances, Weehawken's assent to the settlement agreement was valid and binding.

10

Dickson; Plaintiffs conditioned their acceptance on Defendants' agreement to four additional provisions. Defendants accepted all but one of Plaintiffs' conditions, which Judge Dickson communicated to Plaintiffs. Plaintiffs accepted Defendants' response, and Judge Dickson informed the parties they had reached a settlement. Therefore, each party objectively manifested their assent to the settlement terms.

Plaintiffs contend there was no meeting of the minds because the parties held different understandings of several settlement conditions: (1) Plaintiffs thought the certificates of occupancy would be automatically issued; (2) Plaintiffs believed Defendants were required to assist in removing Devaney and anyone else residing in the apartment unit; (3) Plaintiffs understood the term "properties" as used in the settlement terms—"inspections for [Plaintiffs'] properties in Weehawken to be handled by Jersey City (or the DCA)"—to include the Rezoned Property; (5) Plaintiffs anticipated that Defendants would pay the costs associated with referring building inspections and related services to Jersey City or the DCA; and (6) Plaintiffs construed "site plan/development approvals" as used in the settlement conditions to include both zoning and non-zoning issues, such as permitting and certificates of occupancy.

None of these claims, however, amount to a genuine misunderstanding of a material term of the settlement. It is not a material misunderstanding for Defendants to agree to issue the certificates of occupancy for the two apartment units at issue while assuming that Plaintiffs would follow the necessary legal mechanisms and processes allowing Defendants to do so. A reasonable party in Plaintiffs' position would know that a government entity cannot issue a certificate of occupancy without first conducting an inspection or following other set procedures designed to ensure public safety. Moreover, there is no dispute Defendants knew Devaney had occupied one of the units for some time and took no action to prevent his occupancy. Given Plaintiffs' allegation

11

that Defendants conspired to coerce Plaintiffs to permit Devaney to occupy the unit, it appears extremely unlikely that Weehawken would not have issued the certificates of occupancy in accordance with the settlement agreement. Nevertheless, the Court will condition its enforcement of the settlement agreement upon Plaintiffs allowing DCA or Jersey City officials to inspect the units and Weehawken issuing the certificates of occupancy.

The remainder of Plaintiffs' objections reveal their "different, secret intention[s] from [those] outwardly manifested," and do not amount to material misunderstandings. See Brawer, 329 N.J. Super. at 283. The fact that Plaintiffs harbored unexpressed assumptions about the meaning of "site plan/development approvals," is particularly uncompelling, given that Defendants rejected this portion of Plaintiffs' demands, removing it from the settlement agreement. Regardless, if Plaintiffs truly intended for "site plan/development approvals" to encompass non-zoning issues such as permitting and issuance of certificates of occupancy, it seems doubtful they would have also included a separate provision that Jersey City or DCA officials handle inspections of Plaintiffs' properties. Moreover, there is no discernible misunderstanding as to the meaning of "properties" as used in Plaintiffs' fourth settlement condition; Defendants accepted the demand that inspections of Plaintiffs' "properties in Weehawken" be handled by Jersey City or the DCA, and Defendants' redlined draft settlement agreement reflects a continued intention to honor this condition, including as to the Rezoned Property.

Plaintiffs' other perceived misunderstandings—that Defendants would remove anyone residing in the unit that Devaney formerly occupied and pay the cost of outsourcing inspections—are nothing more than "new terms sought … or [terms that] pertain to the fair implementation of the settlement," "not the essentials of the settlement." See Bistricer v. Bistricer, 231 N.J. Super. 143, 149 (Ch. Div. 1987). Otherwise stated, "[t]heir absence does not indicate a 'lack of mutuality

of accord between the [parties] or their attorneys in some substantial particulars, or the stipulated agreement is incomplete in some of its material and essential terms.'" See id. (quoting Kupper v. Barger, 33 N.J. Super. 491, 494 (App. Div. 1955)). Indeed, these supposed misunderstandings would require Defendants to assume responsibilities not obvious or apparent in—but rather, even contrary to—the plain language of the settlement conditions relayed and accepted during mediation.

### b. Should the Settlement Agreement be Voided?

Grounds for voiding an otherwise enforceable settlement agreement include fraud ("a material misrepresentation made with intent that it be relied on, coupled with actual detrimental reliance"), breach of a material term of the agreement, or other "compelling circumstances." See Nolan, 120 N.J. at 472.

Plaintiffs argue the alleged inspections of the Chestnut Street Properties coupled with Defendants' post-settlement "bad faith" behavior warrant denial of the instant motion. The only allegation here that, if substantiated, might justify allowing Plaintiffs to avoid the settlement agreement is Plaintiffs' contention that Tattoli performed an inspection of the Chestnut Street Properties after Defendants agreed property inspections would be handled by officials from Jersey City or the DCA. However, Tattoli's July 7, 2023 letter to Plaintiffs merely states that, "[u]pon further inspection … there does not appear to be an imminent hazard" at the Chestnut Street Properties. See Bailliard Decl., Ex. K. The letter does not indicate that Tattoli or another Weehawken official inspected the Chestnut Street Properties after the parties reached their settlement. Defendants have certified that, "[o]nce the parties settled the matter, neither Defendant Tattoli nor anyone affiliated with Defendants conducted any full property inspection of Plaintiffs' properties." Gilbride Reply Decl. at ¶ 10. Consequently, Plaintiffs have not shown a genuine

13

dispute of material fact as to whether Tattoli inspected the Chestnut Street Properties after the settlement terms were finalized.

Plaintiffs' remaining claims fail to establish a genuine issue of fact as to whether Defendants made a material misrepresentation during mediation or breached a material term of the agreement, or whether there are other compelling circumstances warranting denial of the instant motion. Again, the alleged pattern of bad faith behavior merely reflects Plaintiffs' insistence that Defendants assume obligations outside the scope of the settlement agreement and Defendants' refusal to do so. Plaintiffs ask the Court to view Defendants' post-settlement conduct in context of the underlying allegations of this nearly decade-long litigation, and the Court acknowledges that framing Defendants' conduct against that backdrop helps explain why the parties' relationship deteriorated so quickly after a successful mediation. However, Defendants' alleged bad faith conduct does not amount to compelling circumstances that would justify allowing Plaintiffs to retract their clear, objective acceptance of the carefully negotiated settlement terms. Rather, again, Plaintiffs seek to fill perceived gaps in the settlement agreement with provisions that were not mentioned during mediation and, therefore, not part of the resulting agreement.

In conclusion, the undisputed material facts establish that the parties entered into a valid, enforceable settlement agreement on or about June 28, 2023.

### III. CONCLUSION

The arguments Plaintiffs make for the settlement agreement not being enforceable, or for voiding the settlement agreement, are simply indicative of buyer's remorse. Defendants have demonstrated the absence of a genuine dispute as to any material fact and are entitled to enforcement of their settlement agreement with Plaintiffs.

For the foregoing reasons, Defendants' motion to enforce the settlement agreement (ECF No. 214) shall be **GRANTED**; however, the Court conditions its enforcement of the settlement agreement upon Plaintiffs allowing DCA or Jersey City officials to inspect the two apartment units located at 63 Chestnut Street in Weehawken and Weehawken issuing certificates of occupancy for same.

/s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated: April 23, 2024